[Civ. No. 14550. First Dist., Div. One. May 14, 1951.]

JAMES BUTLER et al., Respondents, v. CITY AND COUNTY OF SAN FRANCISCO et al., Appellants.

Dion R. Holm, City Attorney, and Norman Sanford Wolff, Deputy City Attorney, for Appellants.

Milton Marks, Jr., for Respondents.

WOOD (Fred B.), J.—In an action brought by sheet metal workers, who were in the employ of the City and County of

San Francisco, against the city and county, the members of its board of supervisors, and the members and secretary of its civil service commission, the superior court rendered judgment October 25, 1949, in which it decreed: (1) That plaintiffs were entitled to receive for their services compensation at the rate of $17 per day from July 1 to December 31, 1948, and at the rate of $18 per day from January 1 to June 30, 1949; (2) that it is the duty of defendants to establish said rates of pay and do all things necessary for the payment of said rates to plaintiffs; (3) that the city and county is indebted to plaintiffs for services rendered, computed at said rates, less the sums paid them, during said periods; and (4) that a peremptory writ of mandate issue requiring defendants to determine and forthwith pay plaintiffs the differential between the amounts payable to plaintiffs at said rates and the amounts paid them during the fiscal year 1948-1949. Plaintiffs had been paid during said year at the rate of $16 per day.

Defendants have appealed from that judgment; also, from the writ of mandate issued pursuant to the judgment; from a minute order of August 15, 1949, which directed judgment for plaintiffs and instructed plaintiffs' counsel to prepare findings and judgment; and from "any and all other judgments in this action" made in favor of plaintiffs and against defendants. The minute order is not appealable because it showed upon its face that it was a mere preliminary entry authorizing the subsequent judgment. (*Kindig* v. *Palos Verdes Homes Assn.*, 33 Cal.App.2d 349, 354-55 [91 P.2d 645]; see, also, rule 2(b)(2), Rules on Appeal, and *Pessarra* v. *Pessarra*, 80 Cal.App.2d 965 [183 P.2d 279].) Nor is the writ of mandate appealable (*Kindig* v. *Palos Verdes Homes Assn., supra,* 33 Cal.App.2d at 355). The appeals from the minute order and from the writ should be dismissed. The purported appeal from "any and all other judgments in this action" may be disregarded. The record discloses no appealable judgment or order other than the judgment of October 25, 1949.

The correctness or incorrectness of the judgment turns upon the interpretation properly to be placed upon section 151.3 of the San Francisco Charter. The basic feature of that section is a provision to the effect that whenever a group or craft establishes a rate of pay for that group or craft through a collective bargaining agreement with employers and the rate is recognized and paid throughout the industry employing such group or craft in San Francisco, the same rate shall be

paid members of that group or craft engaged in the city and county service. Other provisions of the section establish a procedure for the ascertainment and fixing of such rates for city and county employees. Section 151.3 was added to the charter at the First Extra Session of the Fifty-sixth Legislature and became effective January 9, 1946. (Stats. 1st Ex. Sess. 1946, ch. 8 of Res., p. 233.) .It was amended at the 1947 Regular Session, effective January 7, 1947. (Stats. 1947, ch. 2 of Res., p. 3266.) In the amended form it was operative during the period in question. Its significant provisions read as follows:

"Section 151.3 Notwithstanding any of the provisions of section 151 or any other provisions of this charter, whenever any groups or crafts establish a rate of pay for such groups or crafts through collective bargaining agreements with employers employing such groups or crafts, and such rate is recognized and paid throughout the industry and the establishments employing such groups or crafts in San Francisco, and the civil service commission shall certify that such rate is generally prevailing for such groups or crafts in private employment in San Francisco pursuant to collective bargaining agreements, the board of supervisors shall have the power and it shall be its duty to fix such rate of pay as compensations for such groups and crafts engaged in the city and county service. The rate of pay so fixed by the board of supervisors shall be determined on the basis of rates of pay certified by the civil service commission on or prior to April 1st of each year and shall be effective July 1st following: provided, that the civil service commission shall review all such agreements as of July 1st of each year and certify to the board of supervisors on or before the second Monday of July any modifications in rates of pay established thereunder for such crafts or groups as herein provided. The board of supervisors shall thereupon revise the rates of pay for such crafts or groups accordingly and the said revised rates of pay so fixed shall be effective from July 1st of the fiscal year in which the said revisions are determined.

"Should the budget estimates for the several departments be filed with the controller or transmitted to the mayor before any such report of said civil service commission is received by the board of supervisors, the head of each department

affected by such report may amend its budget estimate to comply with the provisions of such report. . . .

"Not later than the 25th day of July in each year the board of supervisors shall have power and it shall be its duty, subject to the fiscal provisions of the charter but, without reference or amendment to the annual budget, to amend the annual appropriation ordinance and the annual salary ordinance to include the provisions necessary for paying the rates of compensation fixed by the board of supervisors as in this section provided for the then current fiscal year. . . ."

The question upon this appeal is whether or not, under section 151.3, it is the duty of the board of supervisors, when amending the annual appropriation ordinance and the annual salary ordinance on or before July 25th in any year, to fix the compensation of the members of such a group or craft and provide for payment of such compensation, at the rate established by such a collective bargaining agreement if the agreement is executed after the second Monday in July and prior to the adoption of the amendatory ordinances. This question can best be considered in the light of the specific facts developed at the trial.

On January 16, 1947, an agreement was executed by the Sheet Metal Contractors' Association of San Francisco and Sheet Metal Workers' International Association Local No. 104 of San Francisco, which, among other things, prescribed an eight-hour day and a rate of pay of $2.00 per hour for journeymen sheet metal workers. This agreement by its terms was to be effective from March 15, 1947, to June 30, 1948, and to continue in effect from year to year thereafter unless either party desiring a change should file notice in writing of the change desired at least 90 days prior to any subsequent year ending June 30th. This agreement was still in effect during the fiscal year ending June 30, 1948.

On March 4 and March 20, 1948, the union gave notice to defendant civil service commission that negotiations were under way between the union and the contractors' association for an upward revision of the $2.00 per hour rate for the period July 1, 1948, to June 30, 1949. On March 25, 1948, the civil service commission certified to the board of supervisors the rates of pay established by collective bargaining agreements for organized groups and crafts covering employees in the city and county service, including therein a rate of pay of $16 per day for sheet metal workers. On or about June 8 and again on July 5, 1948, the union informed

the secretary of the civil service commission that negotiations with the contractors' association for upward revision of the rate of pay were still pending. On July 7, 1948 (prior to July 12th, the second Monday in July of that year), the civil service commission certified to the board of supervisors the rates of pay in effect as of July 1, 1948, under collective bargaining agreements for certain crafts and groups, and did not include therein any modification of the rate of pay for sheet metal workers as certified by the commission under date of March 25, 1948. On July 12, 1948, the civil service commission reported to the board of supervisors that the commission was informed that negotiations concerning the wage agreement covering sheet metal workers were still pending and possibly would be completed prior to the adoption of the wage schedules by the board of supervisors and a new rate might be effective as of July 1, 1948, but that in the meantime the commission had included the rates for sheet metal workers that were effective under the old wage agreement.

On July 19, 1948, the union and the contractors' association executed a new agreement, which prescribed a rate of pay of $2.12½ per hour from July 1 to December 31, 1948, and of $2.25 per hour from January 1 to June 30, 1949. The union delivered to the secretary of the civil service commission a copy of the new agreement on July 20th and, on July 20th or 21st, a letter directing attention to the change in the rate of pay. On July 23, 1948, the board of supervisors adopted two ordinances, one amending the annual appropriation ordinance, the other amending the annual salary ordinance for the fiscal year ending June 30, 1949, continuing and not modifying the $16 per day rate for sheet metal workers.

From these facts it is clear that in fixing the rate of pay for sheet metal workers in the city and county service for the fiscal year 1948-1949 and in making money available for the payment thereof, the civil service commission and the board of supervisors faithfully and punctually complied with the literal requirements of section 151.3 of the charter. It follows that the rate of $16 per day was duly and regularly established as the rate of pay for journeymen sheet metal workers in the city and county service during 1948-1949, unless there is good reason for departing from a literal reading of the provisions of section 151.3 of the charter.

Respondents contend that the time limits prescribed in the procedural requirements of the section are directory and that the board of supervisors is under a continuing duty, up to the

time of adopting its amendatory ordinances on or before July 25th, to fix rates for such crafts in accordance with rates fixed by collective bargaining agreements executed prior to the adoption of such ordinances, whether the agreements are executed before or after July 1st, and whether the civil service commission has certified those rates or different rates or none at all. In support of this contention, respondents represent that this is a remedial statute which should be liberally construed to carry out the legislative intent of giving public employees the same take-home pay as that received by members of the same craft in private industry; the power of the board to fix compensation rates is plenary, to which the special and limited jurisdiction of the commission must yield; the power of the commission to "certify" is a purely ministerial function; that the expression "on or before" is less mandatory than "not later than"; statutory provisions respecting time are directory unless expressly made mandatory; the use of "shall" in a statute concerning time requirements does not necessarily make the time requirements mandatory; where time requirements are used in a statute to further orderly procedure and aid the conduct of public business by a public body they are merely directory; that the record indicates a contemporaneous interpretation of the section by the commission and the board in harmony with that of the respondents, an interpretation entitled to great weight; and that any other interpretation would lead to the absurd result of enabling the commission to thwart the expressed purpose of the charter by neglecting or refusing to certify rates on or before the dates specified in the charter.

The procedural requirements and the time limits prescribed in section 151.3 may not be thus disregarded. The section deals with the fixing of compensation rates for a fiscal year and the appropriation of money for the payment of such compensation. It, therefore, has a very definite relation to the fiscal and budgetary provisions of the charter. Those provisions, we find, indicate a definite plan and process for the preparation and adoption of the budget for any fiscal year. The fiscal year begins July 1st and ends June 30th of the following calendar year. Not later than the 1st of February, each department head must file with the controller, for check as to form and completeness, two copies of the budget estimate for his department for the ensuing fiscal year. Not later than March 1st following, the controller must complete his check of such estimates, consolidate them, and transmit

them to the mayor, together with a summary and recapitulation thereof, and a statement showing estimated revenues for the ensuing year. The mayor holds such public hearings on these budget estimates as he deems necessary, and may increase, decrease or reject any item, within certain limits. (Charter, § 69.) The budget estimates must include a schedule of positions and compensations showing any increases or decreases requested (§ 70). All increases in salaries shall be determined at the time of the preparation of the annual budget estimates and the adoption of the annual budget and appropriation ordinances (§ 71), but salary rates for classes of employment that are subject to salary standardization are fixed in the manner prescribed by other provisions of the charter.[1] Not later than April 15th, the mayor must transmit to the board of supervisors the consolidated budget estimates for all departments for the ensuing fiscal year, including a detailed estimate of revenues. At the same time, he must submit to the board a draft of the annual appropriation ordinance for the ensuing fiscal year, based upon the proposed budget. After public hearing and not earlier than May 15th, nor later than June 1st, the board must adopt the proposed budget as submitted or as amended, and pass the necessary appropriation ordinance. (§ 72.) The number and rates of compensation for all positions continued or created by the board of supervisors in adopting the budget and each annual or supplemental appropriation ordinance shall be established and enumerated in a salary ordinance, which shall be passed or amended at the same time as the annual or supplemental appropriation ordinance.[2] Rates of compensation enumerated shall be those established by salary standardization schedules. (§ 73.) On or before September 15th, the board of supervisors, by ordinance, shall levy a tax which, together with the total amount of receipts and revenues estimated from all sources, will be sufficient to meet all appropriations made by the annual appropriation ordinance. (§ 78.)

The civil service commission plays an important part in this budgetary process. Section 151 of the charter makes it the duty of the board of supervisors to fix by ordinance from time to time the compensation of all officers and employees of the city and county, with certain enumerated exceptions. In

---

[1] The other provisions appear in sections 151-151.5, incl., of the charter.

[2] A supplemental appropriation ordinance is one which appropriates surplus moneys. It may be adopted at the last meeting of the board in any month. (§ 80.)

the fixing of schedules of compensation as in section 151 provided, the civil service commission shall prepare and submit to the board, and the board adopt, a schedule of compensation which shall include all positions subject to the section. The compensation rates must comply with certain standards expressed in section 151. The schedules recommended by the commission shall be based solely on facts and data obtained by it in a comprehensive investigation and survey concerning wages paid in private employment or in other governmental organizations for like service. The commission shall make a record of its findings as to the generally prevailing rate of pay for each class of employment and recommend a rate of pay for each class in accordance therewith. The commission then transmits to the board the proposed schedules recommended by it, together with a summary of the data obtained and considered by the commission and a comparison showing existing schedules. Before presentation to the board, the proposed schedules and the comparison with existing schedules shall be published once a week for two weeks. The board may approve, amend or reject the schedules of compensations proposed by the commission, but before making any amendment thereto the data which the board considers warrants such amendment shall be transmitted to the commission for review and analysis, and the commission shall make a report thereon to the board, together with a report as to what other changes, and the cost thereof, the proposed amendment will require to maintain an equitable relationship with other rates in the schedule. A schedule of compensations, or amendments thereto, adopted by the board on or before April 1st will become effective at the beginning of the next succeeding fiscal year. A schedule of compensations or amendments thereto adopted by the board after April 1st will not become effective until the beginning of the second succeeding fiscal year.

It is apparent that section 151.3 is, in effect, an amendment of section 151 to the extent of the subject matter covered by section 151.3. In the case of craftsmen in the city and county employ, if private industry, pursuant to collective bargaining agreements, recognizes and pays a certain rate of pay throughout the city, the board of supervisors is empowered to adopt that rate of pay after April 1st. It is authorized to do this as late as July 25th, based upon the prevailing rate in private industry as it existed as late as July 1st. It does this after investigation and certification by the civil service commission, the very agency which collects

and appraises data and recommends schedules of compensation for other positions in the city and county service. The dates "on or before" which section 151.3 requires the commission to act (much later than the dates prescribed for the exercise of similar functions under section 151) were doubtless selected as the latest feasible dates consistent with allowing the board of supervisors time within which to introduce, consider and pass the amendatory ordinances necessary for adjustment of rates of pay for inclusion in the annual budget. Whether the functions of the commission are ministerial or not, is of no real aid to the interpretation of section 151.3. They are derived from the charter itself, which, as we have seen, emphasizes and reemphasizes the pivotal importance of punctual performance by each city and county agency of the part given it by the charter in the orderly and timely development and adoption of the city and county budget. Nor is it any aid to interpretation to suggest that if these time requirements are viewed as mandatory the civil service commission, or any other agency having a contribution to make in this budgetary process, could by failing to act prevent the completion and adoption of the budget as a whole or as to some of its parts. The law presumes that public officers will perform their duties faithfully and punctually. The charter provisions must be interpreted in the light of that presumption. If upon occasion some agency should fail in the punctual performance of its duty in the formulation of a fiscal year budget, the law might well afford a remedy. But that question is not before us upon this appeal. For the commission and the board in ascertaining that $16 per day was the prevailing rate of pay for sheet metal workers during the fiscal year 1948-1949, acted in accordance with the facts and in exact and timely compliance with the requirements of section 151.3 of the charter.

■ Something, perhaps, should be said concerning the asserted plenary powers of the board of supervisors. Section 9 of the charter declares that "The powers of the city and county, except the powers reserved to the people or delegated to other officials, boards and commissions by this charter, shall be vested in the board of supervisors and shall be exercised as provided in this charter." This very grant of power imposes limitations upon the board. It withholds power which other provisions of the charter give to "other officials, boards and commissions" (including, of course, the civil service commission). The powers it does give the board must be "exercised as provided in this charter." ■ So, when section 151 says

that the board may approve, amend or reject schedules of compensations proposed by the commission and when section 151.3 says a rate of pay fixed by the board shall be determined on the basis of rates of pay certified by the commission, the charter, it well may be said, is prescribing the manner in which the board shall exercise certain of its powers (after and not before, nor in the absence of, action by the commission) as contemplated by section 9. As said by the Supreme Court in a recent decision, ''It is apparent from the provisions of the new charter that the framers intended to and did formulate a change in the usual concentration of control in the administration of municipal affairs, and thereby provided for a decentralization of powers. Only those powers of the city which are not reserved to the people or delegated to other officials, boards or commissions, are vested in the board of supervisors, to be exercised as provided in the charter.'' (*Kennedy* v. *Ross,* 28 Cal.2d 569, 575 [170 P.2d 904].) Furthermore, the powers conferred upon the civil service commission by sections 140 to 157, inclusive, of the charter, include many that call for the exercise of a wide and sound discretion, —a jurisdiction and responsibility of a high order (by no means ministerial) concerning the classification of positions, the establishment of compensation schedules, and the selection and discipline of personnel. (See *Villain* v. *Civil Service Com.,* 18 Cal.2d 851 [117 P.2d 880]; *Shannon* v. *McKinley,* 62 Cal.App.2d 169 [144 P.2d 433]; *Dierssen* v. *Civil Service Com.,* 43 Cal.App.2d 53 [110 P.2d 513].)

The judgment appealed from is reversed. The appeals from the writ of mandate and from the minute order of August 15, 1949, are dismissed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied June 13, 1951, and respondents' petition for a hearing by the Supreme Court was denied July 12, 1951. Carter, J., voted for a hearing.