[Civ. No. 17909.   First Dist., Div. One.   Sept. 29, 1959.]

GORDON W. MILLER et al., Appellants, v. CITY AND COUNTY OF SAN FRANCISCO et al., Respondents.

H. Ward Dawson, Jr., for Appellants.

Dion R. Holm, City Attorney, and William F. Bourne, Deputy City Attorney, for Respondents.

WOOD (Fred B.), J.—In this action commenced October 20, 1955, maintenance machinists employed by the city and county challenge the rates of pay certified for their positions by the civil service commission and fixed by the board of supervisors for the fiscal years beginning July 1, 1952, and ending June 30, 1956. The rate thus fixed each year was identical with the rate prescribed for maintenance machinists by union contract with the California Metal Trades Association,[1] which rate each year the commission certified as the generally prevailing rate, established by collective bargaining agreements, being paid to maintenance machinists in private industry in San Francisco.

Plaintiffs claim that their duties and responsibilities are more varied and onerous and call for a higher degree of skill than those of maintenance machinists working in plants operated by members of the Metal Trades Association. They claim their work is comparable to that of maintenance machinists employed in breweries and in printing plants, at substantially higher rates of pay established by collective bargaining agreements. They ask (1) that they be paid, for each of those four years, at the rates established by collective bargaining agreements with breweries and newspaper houses, and (2) if that can not be granted, that the rate be fixed pursuant to

---

[1]Hereinafter referred to as "C.M.T.A."

section 151 of the charter at $2.88 per hour for the fiscal year beginning July 1, 1955.

The rates in question were ascertained and established by the commission pursuant to the provisions of section 151.3[2] of the city and county charter, which call for the exercise of a wide and sound discretion, a jurisdiction and responsibility of a high order. (*Butler* v. *City & County of San Francisco*, 104 Cal.App.2d 126, 136 [231 P.2d 75].)

The parties agree that the question is whether or not the commission, in fixing these rates of compensation, acted arbitrarily, whimsically and capriciously, and abused the discretion vested in it by section 151.3.

█ The test to be applied, when reviewing an administrative determination of this character, has been variously stated as follows: Abuse of such administrative discretion "must appear very clearly before the courts will interfere" (*Maxwell* v. *Civil Service Com.*, 169 Cal. 336, 339 [146 P. 869]); where " 'there is fair and reasonable ground for difference of opinion among intelligent and conscientious officials, the action . . . should stand . . . If the action of the commission is not palpably illegal, the court should not intervene.' " (*Pratt* v. *Rosenthal*, 181 Cal. 158, 163 [183 P. 542]); civil service " 'boards are vested with a high discretion and its abuse must appear very clearly before the courts will interfere' " (*Nelson* v. *Dean*, 27 Cal.2d 873, 881 [168 P.2d 16, 168 A.L.R. 467]); "Judicial interference . . . is unjustified except on a showing of arbitrary, fraudulent, or capricious conduct, or a clear

---

[2]Section 151.3 declares that "whenever any groups or crafts establish a rate of pay for such groups or crafts through collective bargaining agreements with the employers employing such groups or crafts, and such rate is recognized and paid throughout the industry and the establishments employing such groups or crafts in San Francisco, and the civil service commission shall certify that such rate is generally prevailing for such groups or crafts in private employment in San Francisco pursuant to collective bargaining agreements, the board of supervisors shall have the power and it shall be its duty to fix such rate of pay as the compensations for such groups and crafts engaged in the city and county service. The rate of pay so fixed by the board of supervisors shall be determined on the basis of rates of pay certified by the civil service commission on or prior to April 1st of each year and shall be effective July 1st following; provided, that the civil service commission shall review all such agreements as of July 1st of each year and certify to the board of supervisors on or before the second Monday of July any modifications in rates of pay established thereunder for such crafts or groups as herein provided. The board of supervisors shall thereupon revise the rates of pay for such crafts or groups accordingly and the said revised rates of pay so fixed shall be effective from July 1st of the fiscal year in which such revisions are determined."

abuse of discretion'' (*Wilson* v. *Los Angeles County Civil Service Com.*, 103 Cal.App.2d 426, 433 [229 P.2d 406]).

The trial court found: On a number of times prior and during said four-year period plaintiffs' union demanded that the commission certify the brewery contract rates. The commission took the brewery rates into account and considered them in formulating its judgment respecting the prevailing rate of pay. On each occasion it was the judgment of the commission that the C.M.T.A. rate was the prevailing rate for maintenance machinists in private industry in San Francisco. In reaching such judgment the rates of pay for all maintenance machinists in San Francisco were taken into account and considered, without differentiating between maintenance machinists upon the basis of the type of business engaged in by the employers or the product being produced by the employers. During all of said times the commission has concluded there is no such dissimilarity between work performed by the city's maintenance machinists and those employed in C.M.T.A. shops as would allow the commission to disregard the C.M.T.A. rate of pay when certifying to the board of supervisors. In formulating its labor and wage surveys the United States Bureau of Labor Statistics does not distinguish between maintenance machinists upon the basis of the business engaged in or the type of product produced by the employer. In establishing such rates of pay defendants did not act arbitrarily, capriciously, contrary to law or in violation of their duty.

The trial court concluded: Defendants have not been guilty of arbitrary or capricious conduct or abuse of discretion. The commission is vested with discretionary power to determine the existence of such facts as would establish a prevailing rate for maintenance machinists in private industry, in San Francisco, arrived at by collective bargaining. A sufficient showing has not been made to allow the court to substitute its judgment for that of the commission respecting the existence, at the times in question, of a prevailing rate of pay for maintenance machinists in private industry in San Francisco, arrived at by collective bargaining.

The evidence supports these findings and conclusions.

The city and county charter requires the civil service commission each year to conduct surveys and report to the board of supervisors rates of pay for over 700 classifications of employees. Section 151, the salary standardization provision of the charter, governs the fixing of the pay of some 9,000 of

16,000 employees and requires the commission to survey the rates of pay being paid in local private industry and other governmental organizations throughout the state and determine the rates being paid for comparable services and make findings based upon such survey. Another section prescribes formulae for fixing the salary rates for policemen and firemen. The charter prescribes some five or six different formulae for fixing the respective rates of pay for various groups of employees. The commission has a staff to aid it in making these surveys, persons who go into the field and conduct studies and investigations.

The commission and its staff were engaged in conducting surveys under section 151 when section 151.3, prescribing a new formula for the fixing of pay rates for various craftsmen (including maintenance machinists[3]), was added to the charter effective in January, 1947. The commission contacted various labor organizations to determine what crafts had collective bargaining agreements, what those agreements were and which of them were actually prevailing throughout the industry in San Francisco, to determine as nearly as they could the comparability of duties, responsibilities, training and experience of the members of the several crafts having such agreements to craftsmen in the employ of the city and county.

It was not an entirely new problem in respect to machinists. In ascertaining machinists' pay rates pursuant to section 151, the commission had ascertained that there was a master agreement between the California Metal Trades Association and Machinists Union Lodge 68 and that the rates it prescribed were prevailing. The rates thus fixed for machinists were certified by the commission to the board of supervisors prior to April, 1947.

In June of that year, the commission was requested to use the rates established in the C.M.T.A. agreement for "construction machinists" engaged in the erection, dismantling and maintenance of machinery and mechanical equipment in breweries, wineries, distilleries, publishing houses and printing press establishments. This request was referred to the commission's staff for investigation and report. The staff member in charge reported on June 28 that the commission's action in using the rate fixed in the C.M.T.A. agreement for "maintenance machinists" was proper because the job descrip-

---

[3]Whenever the word "machinists" is used in this opinion it means "*maintenance* machinists" unless otherwise indicated.

tion for that position was very similar to the job description of machinists in the city and county employ and because the agreement itself limited the "construction machinists'" rate to specific industries. The commission's personnel director concurred in this report. The commission considered this report and on July 9, 1947, concluded that "the rates fixed in private employment for maintenance machinists is the proper rate to be applied to machinists employed by the city."

In March, 1948, the union notified the commission that a new rate was being negotiated under the C.M.T.A. contract. Early in June, 1948, the union reported an increase of 12 cents per hour and requested said increase for the city and county machinists. No request was made at that time for the brewery rate. Upon confirming the fact of the 12 cent increase the commission certified the increase to the board and the board adopted it.

The commission's personnel director testified that each year thereafter the C.M.T.A. contract rates were found to be the prevailing rates for machinists and that the commission had no information which indicated a substantial change until June, 1955, when it had before it information which for the first time indicated that the rate fixed by the C.M.T.A. contract was no longer the prevailing rate in local industry.

Cyril Roche, senior personnel assistant in the commission's division that is responsible for making salary surveys and classification studies for all of the classified positions in the city and county service, testified that in 1954 Lodge Number 68 claimed that the C.M.T.A. agreement no longer fixed the prevailing rate and that the commission should make its determination under section 151 instead of section 151.3. The C.M.T.A. claimed that its contract with the union still set the pattern. Each group submitted supporting data which it was Roche's duty to check. After spending considerable time investigating the facts and analyzing the data, it was his belief that the C.M.T.A. contract still set the prevailing rate for maintenance machinists.

He prepared and submitted to the commission a written report on the subject, dated June 15, 1954. Where the data submitted by the contending parties differed and where one group included employing firms which the other did not he contacted the firms involved and obtained the rates then paid by them respectively. He testified: "... to the best of my knowledge and ability the information on the report was correct, and I assumed it was because when the report was

presented both Lodge No. 68 and California Metal Trades had an opportunity to study it, and no protests or arguments were presented as to anything contained in the report.''

Asked if, after receipt of that report, Lodge Number 68 made any contention that the rates set up in the C.M.T.A. shops should not have appeared in the report ''by reason of the fact that the city work and CMTA work was so dissimilar,'' Roche said ''No. As a matter of fact, when they submitted their data to us they included many CMTA shops in their data.'' He said that Number 68 was not at that time contending that C.M.T.A. work was so dissimilar as not to be comparable to city work; they were only contending that the C.M.T.A. rate was not the prevailing rate. In 1950, when Roche first became engaged in these surveys, the only rates brought to attention by representatives of Number 68 were changes in the C.M.T.A. contract rates for maintenance machinists and those rates were adopted by the commission.[4]

The job descriptions for maintenance machinists under the C.M.T.A. contract continued comparable to those of the city, according to Roche. It was never called to his attention that there was anything new or different in that regard. The United States Department of Labor rate survey bureau showed substantially the same job description. The ''first time the brewery situation arose was in the letter'' of a Mr. Britton in 1954.[5] In the survey covered by his 1954 report Roche found that the greatest number of maintenance machinists doing maintenance work were being paid the C.M.T.A. rate. Many firms that were not members of the C.M.T.A. paid the C.M.T.A. rate and had the same working conditions; i.e., when they bargained they took the C.M.T.A. rates. One such firm had a contract that no skilled craftsman be paid less than the prevailing rates for similar organized craftsmen in the locality and upon the basis thereof paid the C.M.T.A. rates. In making

[4]Counsel for plaintiffs tendered a stipulation that the C.M.T.A. contract was an area wide agreement and covered all employees and maintenance machinists at least through 1951, but not after 1952.

[5]Under date of March 15, 1954, Mr. Britton, on behalf of Lodge No. 68, wrote Mr. Henderson, personnel director, claiming that the rates fixed in the union agreement with the Brewers' Institute were more proper than those fixed in the C.M.T.A. contract.

He said that the latter ''is primarily concerned with employers engaged in the manufacture of durable products, and not with the maintenance of existing machinery ...'' But there is evidence that the C.M.T.A. rates in question in fact applied to machinists engaged in maintaining machinery in those shops, not to machinists engaged in constructing durable goods in those shops.

that survey he took the breweries into account, the newspapers and the printing houses, the number of their employees and their rates. Roche found, of 417 maintenance machinists employed by 62 firms, 177 machinists were in the employ of 40 firms at $2.315 per hour; 19 in the employ of one firm at $2.305 per hour; 14 in the employ of one firm at $2.34 per hour; 87 in the employ of one firm at $2.35 per hour; and that firms paying $2.315 per hour would pay $2.335 commencing July 1, 1954. For these and other reasons mentioned in his report, Roche concluded: ". . . it appears that the certification of $2.335 per hour in the April Report was a proper one and that this same rate will be the prevailing one as of next July 1st."

On July 2, 1954, Mr. Joseph Barnes, Business Representative of Lodge Number 68, wrote protesting the action of the commission on the ground that the C.M.T.A. "does not set the pattern in the area for Maintenance Machinists as such." He said in part "it is true the majority of the Maintenance people as such, had a $2.30 rate, and the reason for this is that our Maintenance Machinists in these independent houses and the houses that are members of certain employer groups [apparently referring to the breweries, newspaper plants and printing establishments], took additional benefits at the previous negotiations in lieu of money." This was not the assertion of a claimed dissimilarity between the duties and responsibilities of the city and the metal trades maintenance machinists respectively.

After the filing of the Roche report, the commission held hearings at which the union representatives were heard at length. Subsequently, on July 9, 1954, the commission denied the request to certify to the board a higher rate than that fixed in the C.M.T.A. contract and recommended in the Roche report.

In February, 1955, while the board of supervisors were considering salary standardization matters under section 151, counsel for plaintiffs presented a letter to the board urging that rates of pay for machinists be set pursuant to the provisions of section 151 instead of section 151.3, asserting that there were nine different rates of pay for maintenance machinists in San Francisco, established by different contracts, ranging from $2.335 to $2.88 per hour, and that no one of those rates was "recognized and paid throughout the industry" in San Francisco and none could be certified by the commission as a "generally prevailing" rate as required under section 151.3.

The board referred that letter to the city attorney and requested his opinion. In rendering it he said he had consulted with the commission's personnel director and that "In my consultation with the secretary I have reviewed the minutes of the Commission and the reports of the staff concerning the question of the rate of pay to be set as the wages for M-254 Machinists for the past few years. From this consultation and review I have determined that the Commission is aware of the situation regarding the number of contracts existing as set forth in your enclosure, and in studying the effect of these various contracts on their authority to set the wages of the concerned employees pursuant to section 151.3 they have determined which of the rates of pay is generally prevailing and is being paid to machinists who most closely perform the work of the occupants of the position M-254 Machinist in the City and County service. In making this determination they have exercised the discretion placed in them by the Charter, and there appears to be no abuse of such discretion."

At that time (February-March, 1955), according to the testimony of the commission's personnel director, the commission had no information that any significant changes had taken place since June and July of 1954. Accordingly, in March, 1955, the commission certified the C.M.T.A. contract rate, adjusted upward pursuant to the cost of living clause of that contract.

Later, in June of 1955, when the commission was reviewing the agreement for the discovery of "any modifications in rates of pay established thereunder for . . . crafts or groups as . . . [in § 151.3] provided," for certification to the board of supervisors on or before the second Monday in July, it appeared that no modification in the C.M.T.A. contract had been made but it was discovered that various firms were now paying higher rates than those prescribed in that contract. The commission and its staff concluded that the C.M.T.A. rate no longer was the prevailing rate and that it would be necessary to proceed under section 151 instead of 151.3. It was too late to do anything about it for that fiscal year. Section 151.3 required and permitted the certification in July of "modifications" only of prevailing contract rates certified to the board prior to the preceding April 1, and there was no such modification to report. It was not then possible to fix a 1955 rate of pay under section 151. For that section expressly declares that the Board of Supervisors must adopt salary schedules under section 151 each year not later than April 1, to become

effective on July 1 next following and that rates adopted after April 1 do not become effective until July 1 of the next succeeding calendar year. It was impossible under the charter to give relief that could become effective prior to July 1, 1956.[6]

At the commission meeting of July 6, 1955, its personnel director reported: "... we have discussed the matter with the City Attorney and it boils down to this, as I see it, that at the moment we are dealing only with modifications in the contract that occurred since April. There have been no modifications, therefore there is nothing to certify to the Board of Supervisors. Furthermore, if the Commission should decide ... that they could go under 151, any rate we would fix now could not be effective until July 1, 1956." (Commission minutes of meeting of 7/6/55.)

█ It is not necessary to further prolong our recital of the supporting evidence. It is true that plaintiffs presented to the trial court a considerable amount of testimony tending to show that the work of the city machinist is more varied and arduous than that of a C.M.T.A. machinist. It is true also that they are all journeymen machinists and their job descriptions appear to be substantially the same. Equally important, especially in a review of administrative action, is this question: What information did the commission have before it each time when it made a determination? Not what is later developed and presented to a different tribunal in review of the commission's action. Included, of course, is the question whether the commission went about its work and conducted its surveys in a manner reasonably calculated to discover all facts that might bear significantly upon the problem to be solved.

Our examination of the record convinces us that the trial judge had before him adequate evidence upon which to base his findings and conclusions that the commission has not been guilty of arbitrary or capricious conduct or abuse of discretion, and that a sufficient showing has not been made to sanction judicial interference with the wage rate determinations and certifications made by the commission and questioned by the plaintiffs in this case.

█ The relief requested in plaintiffs' second cause of action is predicated upon failure to grant the relief sought in the first cause hereinabove discussed. In such event plaintiffs seek a writ of mandate requiring defendants to pay

---

[6]Such relief, it would appear, was later given but rates of pay effective and operative after June 30, 1956, are not involved in this action.

plaintiffs from July 1, 1955, to June 30, 1956, at the higher rate of $2.88 per hour.

The answer to that request has already been indicated. When the discovery of the applicability of section 151 of the charter was made it was too late to proceed under section 151 and fix a different rate that would be effective prior to July 1, 1956. And section 151.3 furnished no authority to revise the rate certified in March of 1955 because there had been no ''modification'' of the bargaining agreement upon which that rate depended. In the absence of an abuse of discretion upon the part of the respondents in the exercise of their powers and the discharge of their duties, the trial court's denial of relief must be affirmed.

The judgment is affirmed.

Bray, P. J., and Wagler, J. pro tem.,* concurred.

Appellants' petition for a hearing by the Supreme Court was denied November 25, 1959.

*Assigned by Chairman of Judicial Council.