[Civ. No. 21414.   First Dist., Div. One.   June 4, 1964.]

HENRY THOMLINSON et al., Plaintiffs and Appellants, v. CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Respondents.

Joseph P. G. Maltaman for Plaintiffs and Appellants.

Thomas M. O'Connor, City Attorney, and Bernard J. Ward, Deputy City Attorney, for Defendants and Respondents.

SULLIVAN, J.—Appellants appeal from a judgment denying their petition for a writ of mandate[1] and discharging the alternative writ of mandate theretofore issued against respondents.[2]

---

[1] The petition was filed by Henry Thomlinson ''on behalf of himself and all the other San Francisco Power House Operators, similarly situated and united in interest as a class.'' We preserve the pluralized usage of ''petitioners'' found in both the record and briefs.

[2] Respondents below and herein are: City and County of San Francisco, a body politic; Harry Ross, as Controller thereof; Harold Mayers, as Superintendent of Motive Power Department of the Municipal Railway thereof; Civil Service Commission, Hubert Soher, Richard Ham and William Kilpatrick as members thereof.

Petitioners are civil service employees of respondent city and county and employed by it as power house operators, designated as Class Number 7364 in the Motive Power Department of the Municipal Railway. Their petition filed in the court below alleged in substance the following: On March 29, 1962, respondent Civil Service Commission of the City and County of San Francisco (hereafter referred to as the commission) acting pursuant to section 151.3 of the charter[3] of respondent city and county certified to the board of supervisors of the city and county (hereafter referred to as the board) that the rate of $135.15 per week was the prevailing rate of pay for power house operators in private employment in San Francisco as established through collective bargaining agreements with employers. On April 23, 1962, the board adopted and fixed said certified rate as the rate of pay for petitioners for the fiscal year beginning July 1, 1962, and ending June 30, 1963, as contained in city and county ordinance 106-62 and in particular section 8.22 thereof.

It is undisputed that the collective bargaining agreement on which the commission based its certification to the board was an agreement between Pacific Gas and Electric Company and Local Union No. 1245 of International Brotherhood of Electrical Workers dated July 1, 1960. Petitioners so alleged

[3]Section 151.3 of the charter in relevant part provides: ''Notwithstanding any of the provisions of section 151 or any other provisions of this charter, whenever any groups or crafts establish a rate of pay for such groups or crafts through collective bargaining agreements with employers employing such groups or crafts, and such rate is recognized and paid throughout the industry and the establishments employing such groups or crafts in San Francisco and the civil service commission shall certify that such rate is generally prevailing for such groups or crafts in private employment in San Francisco pursuant to collective bargaining agreements, the board of supervisors shall have the power and it shall be its duty to fix such rate of pay as the compensations for such groups and crafts engaged in the city and county service. The rate of pay so fixed by the board of supervisors shall be determined on the basis of rates of pay certified by the civil service commission on or prior to April 1st of each year and shall be effective July 1st following; provided, that the civil service commission shall review all such agreements as of July 1st of each year and certify to the board of supervisors on or before the second Monday of July any modifications in rates of pay established thereunder for such crafts or groups as herein provided. The board of supervisors shall thereupon revise the rates of pay for such crafts or groups accordingly and the said revised rates of pay so fixed shall be effective from July 1st of the fiscal year in which such revisions are determined.''

in their petition and attached thereto as an exhibit a copy of such agreement.[4] It is also undisputed that from the time of the original certification by the commission on March 29, 1962, of the $135.15 rate of pay until the second Monday of July 1962, that is July 9, 1962, there had been no modification of the above mentioned collective bargaining agreement. It is to be noted that under the proviso contained in section 151.3 of the charter (see footnote 3, *ante*) it was incumbent upon the commission to review "all such agreements" and to certify to the board "on or before the second Monday of July any modifications in rates of pay established thereunder. ..." Nevertheless, according to the uncontradicted facts in the record, the commission in its report to the board in July 1962 certified a weekly rate of pay of $131.40. Thereafter on July 23, 1962, the board passed ordinance 206-62 reducing petitioners' rate of pay from $135.15 to $131.40 per week. The above amending ordinance also amended section 8.22.1 of ordinance 106-62 so as to provide for and define the work week for shift employees among petitioners.

Petitioners sought a writ of mandate in the court below commanding: (1) respondent Harry Ross as the city's controller to pay them at the rate of $135.15 per week and also pay them the $3.75 per week withheld since July 1, 1962; (2) respondent commission to certify to the board the provisions of the above mentioned union-management agreement affecting overtime pay, holiday pay and other related matters to the pay of power house operators; (3) respondent Harold Mayers as superintendent of the Motive Power Department of the Municipal Railway of the city to determine the basic work week and to report to the city controller records of overtime, nonwork day employment and shift hours of petitioners pursuant to section 8.22 of the ordinance passed on April 23, 1962, and to establish what day is a work day and what days are nonwork days; and (4) respondent city and county to compel its subordinates to abide by section 151.3 of the charter. On the filing of the petition, the court below ordered the issuance of an alternative writ of mandate.

Respondents thereafter filed an answer and return to the petition in which they alleged, *inter alia,* that after the com-

---

[4] Appellants did not include the copy of the agreement in the original record brought before us. We have therefore on our own motion ordered the record on appeal herein augmented to include the copy of the agreement contained in the county clerk's file in action No. 525381 in the court below.

mission certified to the board the rate of $135.15 per week a protest was made against such rate on the ground that it was not being paid within the geographical limits of the City and County of San Francisco; that the commission, after making a field investigation, determined that no such rate was being paid within the geographical limits of the city; that thereafter, based upon the fact that it had committed an error in its original certification, the commission in its report to the board in July 1962 "corrected this error by certifying the proper rate of $131.40 per week"; and that this was done to meet the requirements of section 151.3 of the charter, the commission believing that it had the inherent power under such charter provision "to correct any and all mistakes of fact made by them prior to the final adoption of any ordinance setting a rate of pay."

The cause was submitted on the above pleadings and certain exhibits.[5] After submission, the parties stipulated to a waiver of findings of fact and conclusions of law. The court entered judgment denying the petition for the writ and discharging the alternative writ.

The record before us discloses without any conflict the following essential facts: The commission originally certified to the board a rate of pay of $135.15 per week and subsequently within the time prescribed by section 151.3 certified a lower rate of $131.40 although in the meantime there had been no modification of the collective bargaining agreement on which the rate of pay was based. As the answer and return alleged, the commission found on further investigation that the first rate of $135.15 was not being paid within the geographical limits of San Francisco and that it had made an error in its original certification in March 1962, which it corrected in July 1962 by certifying the proper rate of $131.40. Since petitioners have not controverted the allegations of the answer relating to the discovery and correction of the error, such allegations will be accepted as true. (Code Civ. Proc. § 1091; *Hunt* v. *Mayor & Council of Riverside* (1948) 31 Cal.2d 619, 623 [191 P.2d 426]; *Kimberlin* v. *Los Angeles City High School Dist.* (1953) 115 Cal.App.2d 459, 464 [252 P.2d 344]; *Day* v. *City of Los Angeles* (1961) 189 Cal.App. 2d 415, 418 [11 Cal.Rptr. 325].) At oral argument the parties pointed out to us what actually happened: The commis-

---

[5]The instant record includes no transcript of any oral proceedings. Only two exhibits have been brought before us which contain the two ordinances involved.

sion based its March certification of the $135.15 rate on a schedule of wage rates as amended July 1, 1961, which is part of the collective bargaining agreement contained in a booklet attached to the petition for the writ. The particular rate made applicable by the certification was one for operators at "Sta. H—San Francisco" for which a rate of $135.15 appears in the booklet. However, as the parties conceded at oral argument, although described "San Francisco," Station H of the Pacific Gas and Electric Company was not located within the geographical limits of San Francisco but just across the county line in San Mateo County. If this rate is eliminated, the booklet shows a rate of $131.40 for several stations of said company which are located in San Francisco.

We therefore face the question whether or not respondent commission had the power under the above section of the city's charter to correct an erroneous certification of rate of pay.

■ The purpose of section 151.3 of the Charter of the City and County of San Francisco is to provide "a standard for determining rates of pay that will insure these public employees a wage scale commensurate with wages received by workers in the same field in private industry." (*Adams* v. *Wolff* (1948) 84 Cal.App.2d 435, 443 [190 P.2d 665].) To state it more plainly, it is the intent of the above section that public employees of the type described therein shall receive the same compensation as that received by the same type of employees in private industry *in San Francisco*. (*Adams* v. *Wolff, supra,* 84 Cal.App.2d 435, 443, 444-445; *Adams* v. *City & County of San Francisco* (1949) 94 Cal.App.2d 586, 591 [211 P.2d 368, 212 P.2d 272] ; *Butler* v. *City & County of San Francisco* (1951) 104 Cal.App.2d 126, 134-135 [231 P.2d 75] ; see also *Gowanlock* v. *Turner* (1954) 42 Cal.2d 296, 308-309 [267 P.2d 310].) The certification of the rate of pay by the commission "on or prior to April 1st of each year" is a part of the orderly process for the preparation and adoption of the city's budget. (*Butler* v. *City & County of San Francisco, supra,* 104 Cal.App.2d 126, 132, 135.) ■ The obvious purpose in providing in section 151.3 for the commission's review of collective bargaining agreements as of July 1st and for the certification "on or before the second Monday of July" of any modifications of the rates established thereunder, is to insure that rates of pay for the new fiscal year shall be those actually prevailing at its start on July 1. The

commission's deadline for accomplishing this purpose—the second Monday of July—was selected as the latest feasible date "consistent with allowing the board of supervisors time within which to introduce, consider and pass the amendatory ordinances necessary for adjustment of rates of pay for inclusion in the annual budget." (*Butler* v. *City & County of San Francisco, supra,* 104 Cal.App.2d 126, 135.) ▪ Realistically appraised in the light of continuously rising rates of pay in private industry, the proviso of section 151.3 protects civil service employees covered by it in the event of modifications of rates between April 1 and July 1 of any year. But the basic purpose of the section predominates: that they shall be entitled to the rate of pay generally prevailing in private employment in San Francisco on July 1—whether that be more or less than that prevailing on or prior to April 1.

▪ As we have pointed out, in order to effectuate the purpose and intent of section 151.3, the commission was invested with the express power to review collective bargaining agreements and to certify to the board any subsequent modifications thereunder. We think that this express authority to review the agreement included and necessarily implied the power of the commission during such review to correct its previous error as a means of accomplishing the purpose of the charter provision and of efficiently carrying out the commission's reviewing functions thereunder. (See 2 Cal.Jur.2d, Administrative Law, § 16, pp. 31-32.) Section 151.3 required the commission to certify a rate of pay *generally prevailing* in private employment *in San Francisco,* not in some other county. It is manifest to us that the commission certified the rate of $135.15 only because it appeared to be a rate generally prevailing *in San Francisco.* If on review the commission had found such rate of pay not to be *generally prevailing* because of a modification of the agreement, it would have had the express power to certify to that effect. It seems to us to be within the spirit of the charter provision that where on such review the commission discovers that it has erroneously certified a rate of pay in private industry not applicable to San Francisco, and therefore *not prevailing at all,* it has the implied power to correct the error. Furthermore it is to be noted that the error was not due to any fault of the commission but existed in the language of the collective bargaining agreement which the commission considered.

▪ Section 151.3 must be applied in a manner which is at once consonant with its objectives and also fair and just

not only to the employees involved but to the general public. We cannot refrain from observing that if the error had been the other way so that petitioners would have been saddled with a *lower* rate actually not prevailing in San Francisco, no one could rightly deny that the purpose and spirit of the section would require its correction on review so as to insure to the public employees involved the compensation to which they would have been entitled. In the instant case petitioners suffer no injustice since they ultimately receive what they are entitled to. They are denied nothing but a "windfall" occurring through an error. This they are not entitled to.

Our research discloses no California case directly in point although the situation in the case before us is somewhat analogous to that in *Golden State Milk Products Co.* v. *Southern Sierras Power Co.* (1931) 117 Cal.App. 121 [3 P.2d 352], cited by respondents. In *Golden State Milk Products Co.* a third party had sold its business to the defendant, subject to the order of the Railroad Commission that the "consolidation" would not result in any change of management or rates. The charges of the former company had originally been fixed by schedule "P-2." In effecting the consolidation, the defendant by mistake filed with the Railroad Commission schedule "P-22" which if followed would have resulted in lesser charges to the plaintiff than he had been paying under "P-2." The Railroad Commission then authorized defendant to operate under a new schedule "P-31" which fixed the same charges as that fixed by "P-2." Plaintiff contended that the increased rates fixed by "P-31" were invalid since the commission had not, as required by section 63a of the Public Utilities Act, made a prior finding that such increase was justified. In rejecting plaintiff's contention, the court noted: "Furthermore all of the facts appeared on the records and files of the Railroad Commission. Those records and files showed that a mistake had been made and the full scope of that mistake. In the absence of express statutory authority, municipal boards, charged with the duty of keeping records have the power and it is their duty to amend their records so they will speak the truth. (43 C.J. 517.) When schedule 'P-31' was filed and schedule 'P-22' was refiled the object, sought to be accomplished by the purchase by this defendant of the properties of the Holton Co. was made fully effective and the error committed by filing on January 1, 1924, schedule 'P-22' was cured." (Pp. 124-125.)

*Miller* v. *City & County of San Francisco* (1959) 174 Cal.

App.2d 109 [344 P.2d 102], relied on by petitioners, is distinguishable from the instant case. In *Miller* the commission certified each year as the generally prevailing rate of pay for maintenance machinists the rate prescribed by a specified union contract with the California Metal Trades Association. In June 1955 (i.e., prior to the beginning of the fourth fiscal year involved) the commission received information indicating for the first time that the rate fixed by the above C.M.T.A. contract was no longer the prevailing rate in local industry. No modification of the C.M.T.A. contract had been made but various firms were then paying higher rates than those provided for in such contract. The commission concluded that since the C.M.T.A. rate was no longer prevailing it would be necessary to proceed under section 151 instead of section 151.3 of the charter but that it was then too late to proceed under section 151 so as to obtain a rate effective beginning July 1, 1955. It also concluded that since there were no modifications to the C.M.T.A. contract, there was nothing for it to certify to the board. The court held that in reaching these conclusions, the commission was not guilty of an abuse of discretion. In *Miller* therefore the court was not faced with the problem of correcting an *erroneous* certification of a rate established by a collective bargaining agreement. The situation in *Miller* called for the commission not to follow the agreement but to ignore it because it no longer established the prevailing rate. The problem there presented was not one of effectuating the objectives of section 151.3 but of abandoning the procedure of 151.3 for that of 151 of the charter. As the commission properly concluded, it was too late to invoke such procedure for the next succeeding fiscal year.

We turn to petitioners' contention that the substitution in the amendatory ordinance passed on July 23, 1962, of a weekly cycle for the basic work week affected petitioners' weekly take-home pay and was therefore illegal under section 151.3 of the charter.

The only allegation in the petition filed below, bearing upon this subject, states in substance that respondent Mayers, as superintendent of the Motive Power Department of the Municipal Railway refused to abide by section 8.22 of the ordinance passed by the board on April 23, 1962, and "has failed and still refuses to determine the basic week of employment of your petitioners in order that overtime pay be determined." In their answer and return, respondents de-

nied this allegation and alleged "that the amendment to section 8.22 of the ordinance of the Board of Supervisors, passed July 9, 1962, prevails over any pre-existing language in said section. Respondent Harold Mayers has been and will continue to abide, in relation to the rate of pay to petitioners, by the language of the ordinance as finally passed July 9, 1962."[6] The record also shows that the parties stipulated in writing in the court below that "[p]etitioners are shift employees and are working a cycle of four weeks and during which cycle they work twenty (20) days and are off eight (8) days, and that the cycle begins on different days in each week."

Section 8.22.1 of ordinance 106-62 (passed by the board on April 23, 1962) as amended by ordinance 206-62 (passed by the board on July 23, 1962) entitled "Hours of Work" provides as follows: "A work week, *except as elsewhere provided for shift employees,* consists of seven (7) consecutive calendar days, with a basic work week of five (5) work days of eight (8) hours each—Monday through Friday, or from Tuesday through Saturday. The regular hours of work shall be from 8 A.M. to 12 o'clock noon and from 1 P.M. to 5 P.M. *The work week of shift employees shall be regularly scheduled and may start on any day of the week and at any hour of the day. The five (5) work days and two (2) non-work days in the work week of shift employees may be arranged in cycles of one, two, or more weeks. The work day of shift employees shall consist of eight (8) consecutive hours.*" (Italics added.) The portion added by amendment is shown above in italics.[7] Sections 8.22.2 and 8.22.3 of the above ordinance deal with "overtime" and "shifts" respectively.[8] It is not essential to our present discussion that we set forth these latter sections at length. It is sufficient to note that section 8.22.2 entitled "overtime" at all times provided

---

[6] The date of July 9, 1962, is obviously an error since respondents' exhibit A in evidence shows that the amendatory ordinance 206-62 was passed by the board on July 23, 1962, and approved by the mayor on July 25, 1962.

[7] Section 8.22.1 of ordinance 106-62 as originally enacted provided: "HOURS OF WORK: A work week is defined to consist of seven (7) consecutive calendar days, with a basic work week of five (5) work days of eight (8) hours each—Monday through Friday, or from Tuesday through Saturday. The regular hours of work shall be from 8 A.M. to 12 o'clock noon and from 1 P.M. to 5 P.M."

[8] Section 8.22.2 was, and section 8.22.3 was not, amended by ordinance 206-62.

that "[c]ompensation at the rate of one and one-half (1-1/2) times the straight rate of pay shall be paid for ... time worked on a non-work day;..."

The gist of petitioners' argument is this: Section 8.22.1 as originally enacted established a basic work week of five consecutive days of eight hours each—"Monday through Friday, or from Tuesday through Saturday." (See footnote 7, *ante*.) Time actually worked on either of the non-work days is defined as overtime and would entitle petitioners to overtime pay and thus to a higher weekly "take home pay," if they performed such overtime work. The effect of providing for a four-week cycle of work[9] in the amendatory ordinance (see § 8.22.1 supra) is "that appellants may be compelled to work on any twenty (20) days in the twenty-eight (28) day cycle, which may begin on any day of the week. Appellants would be compelled to work on the non-work days as defined by the original ordinance of April 1962 without overtime compensation." This, say petitioners, results in a material reduction in their take-home pay.

The argument is entirely devoid of merit. Petitioners admitted by their written stipulation already adverted to, that they are shift employees working a cycle of four weeks, that the cycle begins on different days in each week, and that during the cycle they work 20 days and are off eight days. The work week of shift employees still consists of five work days and two non-work days, the only difference being that such week may begin on any day and may be arranged in cycles, here a four-week cycle. Petitioners still work no more than 40 hours per week. Under section 8.22.1 as originally enacted the non-work days were Saturday and Sunday or Sunday and Monday. Under the amendment providing for shift employees, depending on when the work week for such employees starts, Saturday and Sunday or Sunday and Monday might well constitute work days but in the same work week the five work days are still followed by two nonwork days although they may fall on other days of the week. Petitioners are compensated for a five-day, 40-hour week. If they work on a non-work day they are still entitled to overtime pay under section 8.22.2. Under the amendatory ordinance the result is the same. The amendment establishing and defining the work week for shift employees thus merely provided for a

[9]Actually section 8.22.1 as amended provides for cycles of "one, two, or more weeks." (See § 8.22.1, *supra*.)

change in working conditions and brought about no change or reduction in petitioners' basic rate of pay. (*Gowanlock* v. *Turner, supra,* 42 Cal.2d 296, 309.)

The judgment is affirmed.

Bray, P. J., and Molinari, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 29, 1964.