[Civ. No. 39059. First Dist., Div. One. Jan. 24, 1978.]

ROBERT KILLIAN et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO et al.,
Defendants and Appellants.

**COUNSEL**

Neyhart & Anderson, John L. Anderson and Jerome M. Garchik for Plaintiffs and Appellants.

Lowenthal & Lowenthal, Morris Lowenthal and John R. Jacobson for Defendants and Appellants.

## OPINION

**RACANELLI, P. J.**—The City and County of San Francisco and its board of supervisors (hereinafter City and Board, respectively) appeal from the judgment[1] of the trial court issuing a peremptory writ of mandate based upon a theory of estoppel. The action was instituted by five labor organizations,[2] representing craft members employed by the City, together with several individual employees of the City on behalf of themselves and all employees similarly situated. The writ mandates the Board to adopt an appropriate ordinance amending the salary ordinances of the City (and to appropriate sufficient funds) to provide increases in wages and other benefits to certain City employees as certified by the civil service commission (hereinafter Commission) for the 1974-1975 fiscal year, and awards costs and attorney fees. Plaintiffs and respondents (hereinafter Petitioners) cross-appeal from those portions of the judgment requiring delivery of executed and ratified agreements by no later than July 1. For the reasons stated herein, we conclude that the writ was properly issued; however, we modify the judgment and affirm the judgment as so modified.

The dispute turns upon the proper interpretation and application of section 8.403[3] of the City charter, the crafts salary standardization

---

[1]The City and Board additionally appeal from the order denying their motion to set aside and vacate the judgment. Such an order is nonappealable (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 91, pp. 4098-4099), and the appeal therefrom is dismissed.

[2]The craft unions involved are: Laborers International Union, Local Union No. 261, AFL-CIO; International Brotherhood of Electrical Workers, Local Union No. 6, AFL-CIO; International Brotherhood of Electrical Workers, Local Union No. 202, AFL-CIO; and Operating Engineers, Local Union No. 3, AFL-CIO. The International Brotherhood of Teamsters, Local Union No. 216, a petitioner below, did not prevail and has raised no appeal.

[3]The full text of section 8.403 is as follows:

"Whenever any groups or crafts establish a rate of pay for such groups or crafts through collective bargaining agreements with employers employing such groups or crafts, and such rate is recognized and paid throughout the industry and establishments employing such groups or crafts in San Francisco and the civil service commission shall certify that such rate is generally prevailing for such groups or crafts in private employment in San Francisco pursuant to collective bargaining agreements, the board of supervisors shall have the power and it shall be its duty to fix such rate of pay as the compensations for such groups and crafts engaged in the city and county service. The rate of pay so fixed by the board of supervisors shall be determined on the basis of rates of pay certified by the civil service commission on or prior to April 1st of each year and shall be effective July 1st following; provided, that the civil service commission shall review all such agreements as of July 1st of each year and certify to the board of supervisors on or before the second Monday of July any modifications in rates of pay

ordinance. The pertinent[4] part thereof provides as follows: ". . . provided, that the civil service commission shall review all such agreements as of July 1st of each year and certify to the board of supervisors on or before the second Monday of July any modifications in rates of pay established thereunder for such crafts or groups as herein provided. The board of supervisors shall thereupon revise the rates of pay for such crafts or groups accordingly and the said revised rates of pay so fixed shall be effective from July 1st of the fiscal year in which such revisions are determined. . . ."

The City and Board contend that the proper interpretation of the language of the proviso means that only modifications (of underlying collective bargaining agreements) in existence and received by or delivered to the Commission on or before the following July 1 may be appropriately reviewed and thereafter certified by the Commission. Petitioners, on the other hand, argue that the construction historically employed by the Commission, namely that agreements executed and delivered to the Commission after July 1 but on or before the second Monday in July, may be certified by the Commission, is the more reasonable one. A subsidiary question concerning a precondition of membership ratification is also presented.

The facts are not in substantial dispute.

For a great many years the consistent practice of the Commission has been to accept and certify to the Board modifications in wage rates

---

established thereunder for such crafts or groups as herein provided. The board of supervisors shall thereupon revise the rates of pay for such crafts or groups accordingly and the said revised rates of pay so fixed shall be effective from July 1st of the fiscal year in which such revisions are determined.

"Should the budget estimates of the several departments be filed with the controller or transmitted to the mayor before any such report of said civil service commission is received by the board of supervisors, the head of each department affected by such report may amend its budget estimate to comply with the provisions of such report.

"Not later than the 25th day of July in each year the board of supervisors shall have power and it shall be its duty, subject to the fiscal provisions of the charter but, without reference or amendment to the annual budget, to amend the annual appropriation ordinance and the annual salary ordinance to include the provisions necessary for paying the rates of compensation fixed by the board of supervisors as in this section provided for the then current fiscal year."

[4]Section 8.403 is a renumbered version of former section 151.3 which was added to the charter in 1946 and amended in 1947. (See *Butler* v. *City & County of San Francisco* (1951) 104 Cal.App.2d 126, 129 [231 P.2d 75].) On November 4, 1975, the San Francisco electorate adopted a measure repealing section 8.403, effective for the 1976-1977 fiscal year. That repeal is presently under challenge in a separate lawsuit.

contained in collective bargaining agreements executed on or before the second Monday of July, so long as the rates were effective July 1 (payable retroactively for work on or after July 1).[5]

By July 8, 1974 (the second Monday in July), the Commission had received from each of the Petitioner unions notification of the newly negotiated wage rates. The date on which each agreement was reached, its effective date, and the date the new rate information was delivered to the Commission are summarized in the margin.[6] As appears, in each case the wage rate information was delivered to the Commission after July 1 and reflected rates of pay effective *before* July 1.[7] On July 8, the Commission verified that the increased rates of pay set forth in the new collective bargaining agreements were effective as of July 1, and transmitted its report certifying such rates to the Board as required by the ordinance.

On July 22, 1974, the Board met to consider the salary standardization ordinance. Because some members of the Board expressed uncertainty as to the meaning of the phrase "agreements as of July 1st" within the intendment of section 8.403, an advisory opinion from the city attorney was requested. The city attorney rendered a written opinion concluding that collective bargaining agreements executed on or after July 1 and not later than the second Monday in July were properly certifiable provided the modifications therein were as of July 1 of that year, the term "as of" being interpreted to mean *effective retroactively* from the date of

---

[5]Mr. George Murphy, senior personnel analyst to the Commission, testified that his primary duty under the charter provision since 1958 was to determine craft wage rates for the initial April 1 survey and for the "follow-up" survey made on or before the second Monday in July of each year; that during his experience in such capacity he had never known the Board to reject rates negotiated and certified after July 1 but on or before the second Monday of July. Mr. Robert Dolan, clerk of the Board for the past 18 years, similarly testified to such continuous Board practice.

[6]

| Labor Organization | Date Agreement Negotiated | Date New Rates Delivered to Commission | Effective Date of New Rates |
|---|---|---|---|
| Laborers, Local 261 | July 2 | July 3 | May 1 and June 16 |
| IBEW, Local 6 | July 5 | July 5 | June 1 |
| IBEW, Local 202 | June 28 | July 3 | June 1 |
| Oper. Engineers, Local 3 | June 27 | July 8 | June 16 |

[7]Mr. Murphy explained that whenever the bargaining agreements contained retroactive rate provisions effective earlier than July 1, the standard practice of the Commission was to certify such rates retroactive only to the July 1 date as specified in the charter provision.

execution. Notwithstanding, the Board declined to accept the questioned wage rate agreements certified by the Commission and deleted such increased pay rates from the salary ordinance amendment upon the ground that certification of wage rates established by agreements executed and delivered after July 1 failed to comply with charter requirements.

The trial court found, inter alia: (1) that all of the Petitioner unions (except Teamster Local No. 216) had delivered to the Commission on or before July 8, 1974, previously executed modifications of collective bargaining agreements establishing rates of pay effective and payable retroactively to July 1, 1974; (2) that such agreements were accepted by the Commission as timely and the new wage rates certified to the Board on or before July 8, 1974.[8] In granting relief to Petitioners upon a theory of estoppel (discussed *infra*), the trial court determined that section 8.403 required that modifications of collective bargaining agreements originally certified on or before the preceding April 1, be in existence, ratified where necessary, and delivered to the Commission on or before the succeeding July 1; that thereafter the Commission must "review and certify" such newly established crafts rates by no later than the second Monday of July. In our view a reasonable construction of the controlling section cannot support such conclusion.

*Construction of Section 8.403*

I.

■ It is elementary that the construction of a statute (or ordinance) and its applicability is solely a question of law. (6 Witkin, Cal. Procedure (2d ed.) §§ 209-210, pp. 4200-4201, and cases there cited.) In undertaking such interpretation, we rely upon familiar principles of statutory construction in order to "ascertain the intent of the . . . [lawmakers] so as to effectuate the purpose of the law." (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) "In determining such intent '[t]he court turns first to the words themselves for the answer.' (*People* v. *Knowles* (1950) 35 Cal.2d 175, 182 [217 P.2d 1], cert. den., 340 U.S. 879 [95 L.Ed. 639, 71 S.Ct. 117].) We are required to give effect to statutes 'according to the usual, ordinary import of the language

---

[8]The court made an additional finding that, with the exception of Local No. 3, ratification where required by a union's internal rules was accomplished prior to July 8, 1974.

employed in framing them.' (*In re Alpine* (1928) 203 Cal. 731, 737 [265 P. 947, 58 A.L.R. 1500]; see also *Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 918 [80 Cal.Rptr. 89, 458 P.2d 33]; *Chavez* v. *Sargent* (1959) 52 Cal.2d 162, 203 [339 P.2d 801], disapproved on another ground in *Petri Cleaners, Inc.* v. *Automotive Employees, etc. Local No. 88,* 53 Cal.2d 455, 473-475 [2 Cal.Rptr. 470, 349 P.2d 76].) 'If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose.' (*Select Base Materials* v. *Board of Equal., supra,* 51 Cal.2d 640, 645); . . . 'When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear.' (*Johnstone* v. *Richardson* (1951) 103 Cal.App.2d 41, 46 [229 P.2d 9]; see also *West Pico Furniture Co.* v. *Pacific Finance Loans* (1970) 2 Cal.3d 594, 608 [86 Cal.Rptr. 793, 469 P.2d 665].) Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole." (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224]; see also 45 Cal.Jur.2d, pp. 625-626 and cases there cited.)

■ Initially we focus our attention upon the language of the ordinance requiring the Commission to "review all such agreements as of July 1st of each year" in fulfilling its duty to certify rate modifications to the Board by no later than the second Monday of July.

While our research discloses no case squarely on point, this court has on more than one occasion reviewed and interpreted certain language of the same salary ordinance now before us (formerly § 151.3). In *Butler* v. *City & County of San Francisco, supra,* 104 Cal.App.2d 126, 130, the question framed by this court was whether the Board was required to fix the wage rate based on collective bargaining agreements "executed *after* the second Monday in July and prior to the adoption of the amendatory [salary and appropriation] ordinances." (Italics added.) We there held that the Commission's certification (five days before the second Monday in July) of rates of pay "in effect as of July 1, 1948 . . ." and the Board's adoption by ordinance of the old wage rates rather than the modifications *executed on July 19* and delivered to the Commission the following day, constituted faithful compliance with the charter provisions. (*Id.* at p. 131.)

■ In *Thomlinson* v. *City etc. of San Francisco* (1964) 227 Cal.App.2d 619 [38 Cal.Rptr. 863], we considered the question whether under charter

section 151.3 (now § 8.403) the Commission had the power to correct erroneously certified rates. In concluding that such power was necessarily implied within the Commission's expressly authorized review function, we described the fundamental purpose and intent of the section in the following manner: "The purpose of section 151.3 of the Charter of the City and County of San Francisco is to provide 'a standard for determining rates of pay that will insure these public employees a wage scale commensurate with wages received by workers in the same field in private industry.' (*Adams* v. *Wolff* (1948) 84 Cal.App.2d 435, 443 [190 P.2d 665].) To state it more plainly, it is the intent of the above section that public employees of the type described therein shall receive the same compensation as that received by the same type of employees in private industry *in San Francisco.* (*Adams* v. *Wolff, supra,* 84 Cal.App.2d 435, 443, 444-445; *Adams* v. *City & County of San Francisco* (1949) 94 Cal.App.2d 586, 591 [211 P.2d 368, 212 P.2d 272]; *Butler* v. *City & County of San Francisco* (1951) 104 Cal.App.2d 126, 134-135 . . .; see also *Gowanlock* v. *Turner* (1954) 42 Cal.2d 296, 308-309 [267 P.2d 310].) The certification of the rate of pay by the commission 'on or prior to April 1st of each year' is a part of the orderly process for the preparation and adoption of the city's budget. (*Butler* v. *City & County of San Francisco, supra,* 104 Cal.App.2d 126, 132, 135.) The obvious purpose in providing in section 151.3 for the commission's review of collective bargaining agreements as of July 1st and for the certification 'on or before the second Monday of July' of any modifications of the rates established thereunder, is to insure that rates of pay for the new fiscal year shall be those actually prevailing at its start on July 1. The commission's deadline for accomplishing this purpose—the second Monday of July—was selected as the latest feasible date 'consistent with allowing the board of supervisors time within which to introduce, consider and pass the amendatory ordinances necessary for adjustment of rates of pay for inclusion in the annual budget.' [Citation.]" (At pp. 624-625.)

 In effectuating the predominant purpose of assuring wage parity with rates generally prevailing in the private sector at the commencement of the new fiscal year, the section establishes a practical time interval as a part of the orderly process for preparation and adoption of the annual budget. (*Butler* v. *City & County of San Francisco, supra,* 104 Cal.App.2d 126, 134-135.) The time frame prescribed for the Commission (July 1 through the second Monday of July) is designed to permit a reasonable period to obtain and investigate data, review and verify new or modified collective bargaining agreements, and certify modifications of rates to the Board in sufficient time to permit the Board to introduce,

consider and pass amendatory ordinances adjusting the rates of pay. (*Id.* at p. 135.)

In light of the basic purpose of the section to provide a standard assuring public employees a wage scale commensurate with like employees in private industry at the beginning of the new fiscal year, the Commission is charged with the paramount duty of ascertaining whether rates of pay previously fixed by the Board as "*certified* by the . . . commission *on or prior to April 1st of each year* . . ." have thereafter been modified "as of" July 1 and to again "*certify* [such modifications] . . . *on or before the second Monday of July* . . . ." (Italics added.) So long as that duty is capable of fulfillment by the July 8 deadline, execution and delivery of the agreements[9] after July 1 would appear to be of no significance in carrying out the purpose of the section.

If, as the City and Board contend, the prepositional phrase "as of" is construed to mean the temporal point at which the review process ends (rather than the effective date of the agreements otherwise subject to review), then the ordinary import of such words within the context of the ordinance as a whole would take on a meaning wholly foreign to its underlying purpose. Such construction would automatically convert the phrase "as of" into the entirely different phrase "on or before." Indeed, where the framers intended to clearly fix precise time limits within which certain acts must occur, the words "on or before" or words of similar import were explicitly used.[10] Acceptance of such a strained interpretation would unduly restrict and conceivably frustrate an important part of the overall remedial design inherent in the ordinance to permit incipient labor-management negotiations to continue to be conducted through the full period covering rate adjustments ultimately subject to wage parity review. There simply is no sound basis upon which to justify a

---

[9]City and Board advance a further argument that the term "agreements" signifies formally written and duly executed bilateral contracts. As they correctly note in their brief, the objects of the charter provision are entirely separate from the objects of labor-management bargaining agreements. The record clearly reveals the Commission followed the common practice of treating binding memoranda of bargaining agreements as valid agreements within the meaning of the provision. Uncontradicted evidence was presented that the Commission usually possessed the written master contracts and routinely accepted duly executed memoranda of changes therein deferring receipt of formally prepared contracts as long as four months later. The argument borders on the frivolous.

[10]For example: in the first paragraph, the rate of pay fixed by the Board (on the basis of rates) certified "on or prior to" April 1; in the third paragraph, "not later than the 25th day of July . . . the board . . . shall . . . [amend the specified ordinances]."

construction which tends to defeat rather than support the "obvious purpose . . . to insure that rates of pay for the new fiscal year shall be those actually prevailing at its start on July 1." (*Thomlinson* v. *City etc. of San Francisco, supra,* 227 Cal.App.2d 619, 624.)

However, if, as Petitioners correctly contend, that language is interpreted to connote the date upon which newly agreed rates became retroactively effective, complete harmony with each of the provisions is achieved: the initial industry survey results are certified on or before April 1 and thereafter fixed by the Board; the "follow-up" survey is made during the ensuing three-month period to consider subsequent modifications in pay rates (whether more or less than that prevailing on April 1 (*Thomlinson* v. *City etc. of San Francisco, supra,* 227 Cal.App.2d 619, 625)), as a part of a continuous process of review and certification concluded by the designated July 8 deadline, and thereafter appropriate Board consideration is undertaken and enabling amendments adopted by no later than July 25 in order that the revised rates based upon the certified modifications "shall be effective from July 1st of the fiscal year" of such revisions. While arguably the phrase standing alone may be susceptible of some ambiguity, viewed in its ordinary and common usage[11] such ambiguity becomes readily clarified as descriptive of the operative or *effective* date of the revised rates submitted for review and certification through July 8.

In at least one authoritative decision reviewing an earlier version of section 151.3 (involving a similar certification process dealing with standardization of wages for municipal railway employees), the court semantically equated "in effect" on July 1 with "as of" July 1.[12] (*Gowanlock* v. *Turner* (1954) 42 Cal.2d 296, 306, 310 [267 P.2d 310]; see *Matthews* v. *Jeremiah Burns, Inc.* (1954) 205 Misc. 1006, 1013 [129

---

[11]The term is typically defined to include "at or on" (Webster's Third New Internat. Dict., p. 129) and "on, at, during, from" (Webster's Seventh New Collegiate Dict., p. 52). Each work gives the example "[takes effect *as of* July 1]."

[12]The portion of section 151.3 then under review relating to municipal railway employees provided:

"Notwithstanding the provisions of section 151 or any other provisions of this chapter the wages of platform employees and bus operators of the municipal railway shall be determined and fixed, annually, as follows:

"(A) On or before the second Monday of July of each year the civil service commission shall certify to the board of supervisors the two highest wage schedules *in effect on July 1st* of that year for platform employees and bus operators of other street railway systems in the State of California; . . ." At page 310 the court interpreted that language to mean wage schedules established *"as of July 1st* of each year." (Italics added.)

N.Y.S.2d 841]; *Horwitz* v. *New York Life Ins. Co.* (9th Cir. 1935) 80 F.2d 295, 299; 17 Am.Jur.2d, Contracts, § 69, p. 408.) In *Matthews* (involving payment of wages under a collective bargaining agreement) the court expressly held that the employer's duty to pay the new wage rate started not on the date the agreement was executed, but rather on the "as of" date designated in the contract. In so holding, that court stated: "It is fundamental that where parties to an agreement expressly provide that a written contract be entered into 'as of' an earlier date than that on which it was executed, the agreement is effective retroactively 'as of' the earlier date and the parties are bound thereby accordingly." (At p. 1013.)

## II.

Moreover, under well-established principles the contemporaneous administrative construction of a statute or ordinance by the administrative agency charged with its enforcement is entitled to great weight and will be followed unless clearly erroneous. (*Rivera* v. *City of Fresno* (1971) 6 Cal.3d 132, 140 [98 Cal.Rptr. 281, 490 P.2d 793]; *Cannon* v. *Industrial Acc. Comm.* (1959) 53 Cal.2d 17, 22 [346 P.2d 1]; *Coca-Cola Co.* v. *State Bd. of Equalization* (1945) 25 Cal.2d 918, 921 [156 P.2d 1]; *Bodinson Mfg. Co.* v. *California E. Com.* (1941) 17 Cal.2d 321, 325-326 [109 P.2d 935]; 5 Witkin, Summary of Cal. Law (8th ed.) § 70, pp. 3308-3309.) The validity of that construction is fortified by the absence of challenge by any interested party to such interpretation of section 8.403 and its predecessor section over such an extended period of time. (See *Cal. M. Express* v. *State Bd. of Equalization* (1955) 133 Cal.App.2d 237, 240 [283 P.2d 1063].)

In summary, applying each of the foregoing principles of statutory construction, we conclude that the interpretation historically given by the Commission is the most reasonable construction in carrying out the purpose and intent of the ordinance. We therefore hold that the proper interpretation of section 8.403 requires the Commission to certify any modifications of collective bargaining agreements executed and delivered on or after July 1 and no later than the second Monday of July, provided such modifications become effective as of July 1 of such fiscal year. Accordingly, we reject any conclusion requiring execution and delivery of such modifications on or before July 1. Further, we find no requirement in the charter review and certification process that such agreements be first ratified by the union membership; nor was any such finding of fact made. In the absence of a showing of palpably arbitrary conduct or a clear abuse, such a judicially engrafted condition would

constitute an improper intrusion into the wide latitude of discretion vested in the Commission. (*Miller* v. *City & County of S. F.* (1959) 174 Cal.App.2d 109, 111-112 [344 P.2d 102].) In any case, the failure to obtain ratification does not invariably affect the validity of a collective bargaining agreement.[13] (See *N.L.R.B.* v. *Brotherhood of Painters, Decorators, etc.* (7th Cir. 1964) 334 F.2d 729, 731.)

### The Theory of Estoppel

■ Even were we to submit to the narrow construction urged by the City and Board, we nevertheless would agree with the trial court's findings and conclusions in support of its judgment based upon a theory of equitable estoppel. Under the circumstances reflected in the record a manifest injustice would be perpetrated upon Petitioners (and the several groups of employees they represent) if the City and Board were not estopped from asserting a failure of compliance with charter requirements concerning a July 1 deadline for submission of the modified collective bargaining agreements.

We need not recite the numerous contentions raised by the City and Board in its voluminous brief on this single issue. Instead, we need only examine the record and determine the existence of substantial evidence in support of the findings, the sufficiency of the findings and whether the principles of equitable estoppel may apply.

### I.

"The doctrine of equitable estoppel is founded on concepts of equity and fair dealing. It provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment. The elements of the doctrine are that (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. (*City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 488-489 [91 Cal.Rptr.

---

[13]As previously noted (fn. 7 *ante*) the issue of ratification is relevant only to the Local No. 3 agreement. As testified by the Commission analyst, it was not uncommon to accept evidence of ratification well after delivery and certification of the negotiated agreements; he further testified if the requisite ratification did not subsequently occur, "we would amend the salary ordinance to reflect" such fact.

23, 476 P.2d 423].)" (*Strong* v. *County of Santa Cruz* (1975) 15 Cal.3d 720, 725 [125 Cal.Rptr. 896, 543 P.2d 264].) "The existence of an estoppel is generally a question of fact for the trial court whose determination is conclusive on appeal unless the opposite conclusion is the only one that can be reasonably drawn from the evidence. [Citation.] When the evidence is not in conflict and is susceptible of only one reasonable inference, the existence of an estoppel is a question of law. [Citation.]" (*Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245].)

The trial court found in favor of Petitioners on all of the requisite elements of equitable estoppel; our independent examination of the record reveals substantial evidence in support of those findings.[14] In our analysis, we treat each of the necessary elements separately.

(1) *Knowledge of past practice*: The evidence reflects a long and unbroken practice of the Commission in accepting and certifying rates of pay contained in modifications of collective bargaining agreements executed and delivered to the Commission after July 1 but on or before the second Monday of July and so long as such modifications became effective on or before July 1 of the same year.

On every other occasion over a period of at least 20 years, the Board routinely accepted rates as so certified by the Commission and enacted salary ordinances to effect the revised rates of pay for City craft employees whose compensation is set pursuant to section 8.403. Further, the Commission and its responsible staff officials regularly notified and advised official representatives of such employees that newly negotiated

---

[14]The findings in relevant part are as follows:

"12. Respondents knew of the long-standing established and consistent application of Section 8.403 . . . by the . . . Commission of accepting and certifying rates of pay of modifications . . . executed and delivered to the Commission on or before the second Monday in July. [and] The City . . . followed this established application and practice and effected compensations to its employees pursuant thereto for at least twenty years.

"13. All of the Petitioner unions, . . . were told by officials of the . . . Commission that the wage rates . . . modifications . . . would be timely received and would be certified to the Board . . . if [said] modifications . . . were executed and delivered to the Commission on or before the second Monday in July 1974. [and] . . . the Petitioner unions . . . relied upon such representations and executed [said] . . . modifications . . . and delivered them to the Commission on or before the second Monday in July 1974.

"14. . . . none of the Petitioners had [prior] knowledge that the Board . . . was planning to or would take such action [deleting the certified rates]. Had Petitioner unions known that the long-standing and consistent application of Section 8.403 . . . was in 1974 to be changed from the second Monday in July to July 1, they could have taken steps to meet the new deadline."

rate revisions, effective on or before July 1, received by no later than the second Monday of July in each year, would be timely accepted and certified; this representation was faithfully honored by the Commission, and salary ordinance amendments were enacted thereon throughout said period of time. Until the instant controversy, the Board had never before rejected wage increases duly certified by the Commission on the ground that modified agreements were due (executed and delivered) by a July 1 deadline. All of the subject agreements and modifications thereof were executed as contracts and delivered to the Commission on or before the second Monday in July; and all of the modified rates of pay were effective and payable retroactively as of July 1, 1974.[15]

The City contends that there is no evidence the Board itself knew of the consistent practice followed by the Commission. Such knowledge may be readily inferred from the long-standing nature of the Commission's practice together with the Board's acquiescence. (See *Canfield* v. *Prod* (1977) 67 Cal.App.3d 722, 731 [137 Cal. Rptr. 27].) Moreover, "[a]n estoppel binds not only the immediate parties to the transaction but those in privity with them. [Citations.] . . . [¶] A public agency may not avoid estoppel by privity on the ground the conduct giving rise to estoppel was committed by an independent public entity. [Citation.]" (*Crumpler* v. *Board of Administration* (1973) 32 Cal.App.3d 567, 582-583 [108 Cal.Rptr. 293].) Clearly both the Board and the Commission are agents of the City; their interests are not independent but mutual: The relationship between them as representatives of the same governing entity is of such nature that estoppel of the Commission is binding upon the Board. (*Id.*; *Lerner* v. *Los Angeles City Board of Education* (1963) 59 Cal.2d 382, 397-398 [29 Cal.Rptr. 657, 380 P.2d 97].) The contention is meritless.

(2) *Intent to induce reliance*: The evidence is undisputed that officials of the Commission expressly informed union representatives that the modifications of wage rates, effective as of July 1, would be certified if executed and delivered on or before the second Monday in July. In fact, the Commission scheduled a public meeting on the second Monday for the very purpose of receiving and considering modifications for certification on that same day.

(3) *Petitioners' lack of knowledge*: The evidence further establishes that Petitioner unions had no earlier notice of any facts or circumstances

---

[15]See footnote 7, *ante*, concerning retroactive treatment of rates effective earlier than July 1.

from which they knew or should have known (*LaRue* v. *Swoap* (1975) 51 Cal.App.3d 543, 551 [124 Cal.Rptr. 329]) that the Board would suddenly change its long-established practice approving such certifications. Although Petitioners were charged with knowledge of the provisions of section 8.403, their reliance on the Commission's certification practice based upon its own interpretation of the section and historically approved by the Board's acceptance, was eminently reasonable and justified. (See *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 492 [91 Cal.Rptr. 23, 476 P.2d 423].)

(4) *Detrimental reliance*: Evidence offered through the testimony of union representatives established that they could and would have accelerated negotiations and executed and delivered the agreements on or prior to July 1 had they known the City would depart from its former consistent practice. Two of the unions had executed their agreements before July 1, and the others in the space of one to four days after July 1 (see fn. 6, *ante*). Clearly, under the total circumstances presented, Petitioners' justifiable reliance on past conduct and assurances of the Commission was detrimental to Petitioners and the several hundred employees they collectively represented who were thereby denied the benefit of increased rates of pay under the modified agreements.

Petitioners have adequately sustained their burden of proof of the necessary elements of the doctrine of equitable estoppel. (7 Witkin, Summary of Cal. Law, § 132, pp. 5351-5352.)

II.

█ Notwithstanding, the City and Board contend that the doctrine may not be applied where to do so would (1) nullify a strong rule of policy adopted for the benefit of the public, or (2) improperly enlarge and exceed the powers given the public entities. These contentions are likewise unpersuasive.

While generally citing *Mansell, supra,* and *Strong* v. *County of Santa Cruz, supra,* 15 Cal.3d 720, City and Board rely[16] principally upon the

---

[16]Cases cited by City postargument provide no new principles or application. In *Lucido* v. *Rippeto* (1977) 73 Cal.App.3d 1 [140 Cal.Rptr. 535], we determined that the parties' mutual ignorance of facts relative to the value of insurance constituted absence of one of the requisite elements of estoppel. In *Hampson* v. *Superior Court* (1977) 67 Cal.App.3d 472 [136 Cal.Rptr. 722], the court held (at p. 483) there could be *no reliance* where an expressly nondelegable statutory power and duty was involved.

earlier holding in *County of San Diego* v. *Cal. Water etc. Co.* (1947) 30 Cal.2d 817 [186 P.2d 124, 175 A.L.R. 747] (involving an attempt to enforce county's agreement to abandon a public easement without statutory notice and hearing compliance), for the proposition that estoppel will not be applied against a governmental body "where it would operate to defeat the effective operation of a policy adopted to protect the public." (*Id.* at p. 826.) That reliance is misplaced.

*Mansell* (at p. 493 of 3 Cal.3d), in singling out *County of San Diego, supra,* as illustrative of the tension between the "twin principles" (invoking the doctrine against government where justice requires as opposed to its inapplicability where a strong public policy would be thwarted) explained the underlying rationale precluding estoppel in terms not only of frustrating strong policy considerations inherent in the applicable statutory requirements but also against agreements " 'by a public body to exercise its discretionary . . . powers in a particular manner' " (*id.* at p. 497), where enforcement would provide a method to " 'evade the law.' " Under such circumstances, the balance is to be struck in favor of preclusion in order to avoid an otherwise "extreme deleterious effect upon public policy . . . ." (*Id.* at p. 498.)

But such countervailing considerations of strong public policy are not presented herein.[17] To the contrary, public policy will be served by applying the doctrine rather than rejecting it. The clear purpose underlying the section "to provide 'a standard for determining rates of pay that will insure these public employees a wage scale commensurate with wages received by workers in the same field in private industry' " (*Thomlinson* v. *City etc. of San Francisco, supra,* 227 Cal.App.2d 619, 624; *Adams* v. *Wolff* (1948) 84 Cal.App.2d 435, 443 [190 P.2d 665]), would be effectively subverted and "a grave injustice would be done if estoppel were not applied, . . ." (*County of San Diego* v. *Cal. Water etc. Co., supra,* 30 Cal.2d 817, 826.) Under the facts established by the evidence, were the City now allowed to impose a July 1 deadline, hundreds of City employees would lose their wage parity unjustly resulting in compensation levels lower than that afforded in private industry, in direct contravention of the purpose and intent of the section.

---

[17]The City's argument that the defeat of Proposition K (a measure to change the "July" reference date to "August") on the November 4, 1969, ballot established a public policy "in favor of a July 1st deadline" is ludicrous. No policy can be divined from a proposed change that the electorate fails to adopt.

As stated in *Mansell*, "The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*City of Long Beach* v. *Mansell, supra,* 3 Cal.3d 462, 496-497; see also 7 Witkin, Summary of Cal. Law (8th ed.) § 138, p. 5358, and cases there collected.) We conclude that in upholding relief based upon estoppel, any harmful effect upon other considerations of public interest or policy is of comparatively insignificant dimension.

■ Finally, the City contends that the effect of applying estoppel doctrine improperly enlarges the powers of the City. This contention is meritless. It is well established that procedural requirements imposed by law may be excused under the doctrine of estoppel (see *Rand* v. *Andreatta* (1964) 60 Cal.2d 846, 849 [36 Cal.Rptr. 846, 389 P.2d 382], and *Farrell* v. *County of Placer* (1944) 23 Cal.2d 624 [145 P.2d 570, 153 A.L.R. 323] [involving claims statutes]) and do not constitute the measure of power itself. (*Id.* at p. 630; cf. *Miller* v. *McKinnon* (1942) 20 Cal.2d 83 [124 P.2d 34, 140 A.L.R. 570].) The time limits prescribed are procedural in nature (see *Butler* v. *City & County of San Francisco, supra,* 104 Cal.App.2d 126, 132) for receipt of relevant information concerning negotiated revisions of wage rates. The application of equitable principles to prevent injustice by excusing Petitioner unions' failure to comply within such time limits, has no effect on the substantive powers of the City or its Board.

Section 8.403 grants the Commission and Board the authority to determine prevailing wage rates effective July 1 of each year based upon a review and certification process, a *procedure* to be completed by the second Monday of July; the Board is expressly empowered to fix such certified rates by amendment to the salary ordinance enacted much later in the same month. Clearly, any delay inherent in the performance of review and certification procedures practiced by the Commission could neither increase nor decrease the plenary authority vested in the Board to enact the appropriate ordinances to achieve the ordained objective of wage parity. Applying estoppel herein will not enlarge that power.

Accordingly, we modify the judgment to strike paragraphs three and four thereof, and as so modified the judgment is affirmed. The appeal from the order denying the motion of the City and Board to set aside and

vacate the judgment is dismissed. Plaintiffs and cross-appellants shall recover their costs on appeal.

Elkington, J., and Broussard, J.,* concurred.

A petition for a rehearing was denied February 21, 1978, and the opinion was modified to read as printed above. The petition of the defendants and appellants for a hearing by the Supreme Court was denied March 23, 1978.

*Assigned by the Chairperson of the Judicial Council.