Filed 4/17/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ASHLEE ELIZABETH PALMER, | |
| Plaintiff and Appellant, | G060880 |
| v. | (Super. Ct. No. 30-2017-00938646) |
| CITY OF ANAHEIM, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Randall J. Sherman, Judge.  Affirmed.

Benink & Slavens, Vincent D. Slavens and Eric J. Benink; Kearney Littlefield, Thomas A. Kearney and Prescott W. Littlefield for Plaintiff and Appellant.

Alison M. Kott, City Attorney; Jarvis Fay, Benjamin P. Fay and Gabriel McWhirter for Defendant and Respondent.

Hanson Bridgett, Adam W. Hofmann and Sean G. Herman for The League of California Cities as Amicus Curiae on behalf of Defendant and Respondent.

## INTRODUCTION

Article XIIIC was added to the California Constitution in 1996 after the passage of the Right to Vote on Taxes Act, or Proposition 218. "Generally speaking, Proposition 218 enacted procedures to be followed by a local government wishing to adopt or increase taxes, assessments, fees or charges." (*Keller v. Chowchilla Water Dist.* (2000) 80 Cal.App.4th 1006, 1008-1009.) Article XIIIC requires that any new tax or increase in tax be approved by the voters. In 2010, article XIIIC was amended when Proposition 26 passed. Since then, "'"tax" has been broadly defined to encompass "any levy, charge, or exaction of any kind imposed by a local government." [Citations.]' [Citation.]" (*City of San Buenaventura v. United Water Conservation Dist.* (2022) 79 Cal.App.5th 110, 114.) Several charges are expressly excluded from this definition, but today we focus on charges "imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product." (Cal. Const., art. XIIIC, §1, subd. (e)(2).)

In this case, the government service or product at issue is electricity. Appellant is an individual residing in the City of Anaheim (the City) who claims her local public electric utility has approved rates which exceed the cost of providing electricity. She claims the City has been transferring utility revenues to its general fund and recouping these amounts from ratepayers without obtaining voter approval. But because voters approved the practice through an amendment to the City's charter, we conclude the City has not violated article XIIIC, and we affirm the trial court's grant of summary judgment to the City on this basis. Though a localized issue, we publish because we think the case may be The Ghost of Christmas Future.

**FACTS**

The City of Anaheim adopted its charter in June of 1964. Since that time, it has owned and operated its own public electric utility, the Anaheim Public Utilities Department (the Electric Utility).

In 1975, a proposal emerged to amend the City charter to add a section limiting the transfer of the Electric Utility revenue to the City's general fund. In prior years, there had been no such restriction, which meant the City could allocate anywhere between six and twenty-four percent of the Electric Utility revenues to help fund general services.

Proposition E, passed by the City's voters in 1976, put a cap on these general fund transfers by adding a section 1221 to article XII of the City Charter (hereinafter, "section 1221"). Section 1221 required the Anaheim City Council to establish electric rates "sufficient to pay" for amongst other things, "operations and maintenance of the system," and "payments to the general fund of the City . . . in each fiscal year in an amount equal to, or less than," a step-down percentage[1] "of the gross revenue earned by the utility during the previous fiscal year." In 1990, the electorate amended section 1221 to remove this step-down percentage, and today, the maximum general fund transfer allowable stands at four percent.[2]

In June of 1994, the city council voted to impose an additional right-of-way fee on the Electric Utility for its use of publicly owned rights of way. This fee is 1.5 percent of the prior year's audited gross sales receipts, and is paid on a yearly basis.[3] The

---

[1]    For the first year after section 1221's adoption, the general fund transfer would be capped at eight percent of gross revenues. For the second year, it would be capped at six percent and for the third year onward, it would be capped at four percent.

[2]    After another ratepayer lawsuit was filed under Proposition 218 in 2012, the City agreed to voluntarily cease the transfers if the voters disapproved them in an election scheduled for 2014. We presume, but are not certain, that those transfers have resumed since the trial court granted the City summary judgment in this case.

[3]    According to surveys of similar municipalities, 1.5 percent was within "the average range of franchise fees being charged to private gas and electric utilities in the area."

city council had surmised private utilities operating on public rights of way should have to pay for them as part of their operating costs. The right-of-way fee was thus intended to compensate the City for the loss of that potential revenue.

Electric Utility rates are designed by its staff and ultimately approved by the city council. The rate structure has three base components: (1) a fixed charge for accessing the electric system, called a "'customer' charge," (2) a variable "'energy' charge" which fluctuates based on the amount of electricity consumed, and (3) a "'demand' charge," for non-residential customers, which varies based on maximum energy consumption during a particular time. On top of the base charge is a rate stabilization adjustment called an RSA. This charge funds a reserve for expenses incurred to mitigate the electrical system's environmental impacts and a reserve to fund the procurement and generation of energy.

Appellant Ashlee Palmer brought a class action complaint against the City in late 2017 after the city council adopted certain modifications to the electric rate schedule. According to one of the Electric Utility's assistant general managers, electric rates have not undergone significant changes since 2015, when the RSA was reduced and base charges were correspondingly increased. But he admits there were some slight modifications, such as an adjustment to demand charges to make them consistent across customer classes. Appellant attacked the new rate schedule not based on these modifications, but on the premise that the rates *overall* encompassed an unconstitutional surcharge comprised of the general fund transfer under section 1221 and the annual right-of-way fee.

Both appellant and the City ultimately decided to file for summary judgment, and, in anticipation of cross-motions, they stipulated as to their scope. Two elements of the stipulation are paramount in our analysis. First, the parties agreed that, for purposes of the cross-motions, the trial court would not need to resolve whether the right-of-way fee is an operations cost of the Electric Utility or whether the fee was

4

"'grandfathered'" in and exempt from voter approval under article XIIIC.  This was because the parties were willing to stipulate that the Electric Utility took in enough non-rate revenue during the applicable timeframe to cover the cost of the fee, and thus, it was not being recouped from customers.  Second, the parties agreed the trial court should grant summary judgment to the City if it found either one of two things to be true.  First, that "Anaheim voters' approval of section 1221 . . . satisfies article XIIC's voter-approval requirements[.]"  Second, that "the portion, if any, of the City's electric rates that funds the general fund transfer is a 'grandfathered' charge exempt from the voter-approval requirements of article XIIIC[.]"  The trial court found section 1221 satisfied article XIIIC voter approval requirements, and granted summary judgment to the City.

## DISCUSSION

Our review of the trial court's grant of summary judgment is de novo.  (See *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.)  But appellant's briefing seems to suggest, incorrectly, that we conduct this review independent of the parameters of the parties' stipulation.  For example, she encourages us to decide "whether the imposition of the right-of-way fee supersedes voter approval of Section 1221 in 1976."

We decline the invitation.  "Parties may, as here, agree by stipulation to limit the issues presented to the trial court" on summary judgment "and the court will respect such stipulation.  (*Title Ins. Co. v. State Bd. of Equalization* (1992) 4 Cal.4th 715, 733.)"  (See *Vulk v. State Farm General Ins. Co.* (2021) 69 Cal.App.5th 243, 263.)  The court is not required to accept any conclusions of law in a stipulation (see *Oakland Raiders v. City of Berkeley* (1976) 65 Cal.App.3d 623, 629), but in general, a party is bound by its own agreement as to what is material.  "'Unless the trial court, in its discretion, permits a party to withdraw from a stipulation [citations], it is conclusive upon the parties, and the truth of the facts contained therein cannot be contradicted. [Citations.]'  (*Palmer v. City of Long Beach* (1948) 33 Cal.2d 134, 141–142.)"

5

(*Robinson v. Workers' Comp. Appeals Bd.* (1987) 194 Cal.App.3d 784, 790.)[4] Appellant seems to think the City and the trial court misconstrued or misunderstood the language of the stipulation. Not so. The trial court rightly assumed the parties meant what they said in their stipulation and acted accordingly. We think it appropriate for us to follow the same protocol.

As we previously stated, appellant has pointed to two potentially problematic elements of the Electric Utility's budget – the 1.5 percent right-of-way fee and the 4 percent general fund transfer. She repeatedly reminds us that her challenge is not to these items standing alone, but to the rate increases which potentially stem from them. Nevertheless, the only way to determine whether the rates were unconstitutionally impacted by them is to consider each item separately.

## I.        Right-of-Way Fee

The parties agreed for purposes of the cross-motions that the Electric Utility took in sufficient non-rate revenue to "fully offset the impact, if any, of the" right-of-way fee on the rates. To our mind (and it seems, to the trial court's as well), this effectively eliminates the right-of-way fee as a point of challenge. As our Supreme Court has concluded, if a specific cost in an agency budget is not actually passed along to the taxpayer, it does not require voter approval under article XIIIC. (See *Citizens for Fair REU Rates v. City of Redding* (2018) 6 Cal.5th 1, 17.) Thus, where the utility has "more than enough nonrate revenue to cover" the questionable cost, it is not a tax. (*Id.* at p. 15.) Since appellant admits the Electric Utility had enough nonrate revenue to cover the right-of-way fee, it is not a tax.

Appellant believes the trial court erred when it disregarded the right-of-way fee completely; she says she never intended to stipulate the entire issue away. She argues

---

[4]        Based on our review of the record, appellant has never sought to invalidate or withdraw from the stipulation and even after receiving the trial court's tentative ruling on the cross-motions for summary judgment (in which the trial court explicitly referred to it), appellant's counsel did not argue the court was misinterpreting the stipulation.

the stipulated fact pertains only to the right-of-way fee when considered *on its own*, not the surcharge when the general fund transfer and right-of-way fee are *combined*. We fail to see any meaningful distinction between the two. For one thing, the parties stipulated nonrate revenue was sufficient to fully offset "any" impact the right-of-way fee had on rates. We interpret the phrase "any impact" to mean "any impact," – either when the fee is considered alone or when it is combined with other budget items. Additionally, the stipulated fact is not conditioned on the right of way fee being considered separate from or together with the general fund transfer. We cannot read a term into the stipulation that isn't there.

II.        **General Fund Transfer and Section 1221**

On this topic, we feel it important at the outset to set forth verbatim the text of section 1221, the language at issue here:

"Section 1221. UTILITY RATES. [¶] The City Council shall establish rates, rules and regulations for the water and electrical utilities. The rates shall be sufficient with respect to each utility to pay:

"(a) For operations and maintenance of the system.

"(b) For payment of principal and interest on debt.

"(c) For creation and maintenance of financial reserves adequate to assure debt service on bonds outstanding.

"(d) For capital construction of new facilities and improvements of existing facilities, or maintenance of a reserve fund for that purpose.

"(e) For payments to the general fund of the City (exclusive of those amounts paid pursuant to subsection (a) of this Section 1221) in each fiscal year, in an amount equal to, or less than, four percent (4%) of the gross revenue earned by the utility during the previous fiscal year.

"Rates shall be reviewed by the City Council periodically to insure that financial goals are being accomplished.

"Rates shall be uniform for all consumers within the same class and shall be based on the cost of service revenue requirement for the class; but different rate schedules may be applied to different classes of consumers. Notwithstanding the foregoing, the City Council may establish, and revise from time to time, ratepayer discount and other programs to assist residential customers in the payment of their utility bills and the costs of such discount and other programs may be paid from utility revenues."

"'In construing a provision adopted by the voters our task is to ascertain their intent. (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 (*Lungren*).) We look first to the words themselves, which should be given the meaning they bear in ordinary use. (*Id.* at p. 735; *Killian v. City and County of San Francisco* (1978) 77 Cal.App.3d 1, 7.) If the language is clear and unambiguous there is no need for construction and courts should not indulge in it. (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 800.) However, this plain meaning rule does not prohibit a court from determining whether the literal meaning of a charter provision comports with its purpose, or whether construction of one charter provision is consistent with the charter's other provisions. (See *Lungren*, *supra*, at p. 735.) Literal construction should not prevail if it is contrary to the voters' intent apparent in the provision. (See *California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333, 340.) "An interpretation that renders related provisions nugatory must be avoided . . . ., [and] each sentence must be read . . . in the light of the [charter's overall] scheme . . . ." (*Lungren*, *supra*, at p. 735.) Provisions relating to the same subject matter must be harmonized to the extent possible. (*Schmidt v. Retirement Board* (1995) 37 Cal.App.4th 1204, 1210.)'" (*White v. City of Stockton* (2016) 244 Cal.App.4th 754, 759.)[5]

---

[5] Because we can construe the charter provision based on its plain language, we need only grant appellant's request for judicial notice as to the charter and its amendments. Judicial notice is also granted as to the city council resolution approving the right-of-way fee. We deny judicial notice of all ballot materials submitted by appellant, either for Proposition E or Proposition 218.

We think appellant's approach would require us to eschew these principles in construing section 1221. She circumlocutes subdivision (e) of section 1221, not acknowledging its plain meaning – to wit, voters agreed a four percent transfer could be built into their rates. She also chooses to construe the various aspects of section 1221 in a way that would essentially nullify certain parts.

Appellant first tries to convince us the voters, in adopting section 1221 (and, in particular, subdivision (e) thereof), were not approving a tax. Instead, she says, voters were requiring the city council to set rates based upon cost of service, and restricting the City's ability to transfer utility revenues to the general fund. In the end, though, what real difference is there between the two? Appellant's concerns are semantical; she wants us to call this horse an ungulate rather than a mammal. But whatever characterization or label appellant accords the transfer, the point she cannot escape is this: the voters approved it: Not only the transfer itself, but the transfer being folded into their rates. The language of section 1221 is unambiguous: "The rates shall be sufficient with respect to each utility to pay . . ." the transfer, amongst other costs.[6]

Appellant then seizes upon section 1221's cost of service requirement language to argue the provision "does not permit the City to overcharge ratepayers to fund the transfer[.]" We disagree. The provision absolutely allows the City to charge ratepayers to fund the four percent transfer, and as a matter of law, any such voter-approved charge cannot be an overcharge. Neither do we think the transfer conflicts with section 1221's cost of service requirement. The best way to harmonize subdivision (e) with the cost of service requirement is to deem the transfer a cost of service. Appellant argues "there is no evidence to support" this interpretation, but again, we see it differently. The evidence is the text itself. If rates are to be based on costs of service and the voters agreed that all items listed in subdivisions (a) through (e) of section 1221

_____

[6] For this reason, we reject appellant's contention that voters approved the transfer being funded through nonrate revenue only. They explicitly did the opposite; they approved it being funded through their rates.

9

should be built into the rates, the only rational construction is that subdivisions (a) through (e) are agreed-upon costs of service.

Appellant believes construing the transfer as a cost of service dooms the City's argument that the rate structure was approved as a tax. But in reality, she is between a rock and a hard place herself. If the rate structure was a tax, it was approved by the voters, and is compliant with article XIIIC. And if the rate structure incorporates only costs of service, there is no need to comply with article XIIIC in the first place.

Because the transfer was approved by the voters, we see no article XIIIC violation.[7] When considered with appellant's admission that the right-of-way fee has no impact on rates, we conclude the trial court correctly granted the City's motion for summary judgment.

## DISPOSITION

The judgment is affirmed. The City shall recover its costs on appeal.


BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


MOTOIKE, J.

---

[7] This is true even though the voters rejected a 2014 ballot measure which would have removed the cost of service language and made the transfer four percent of gross "retail" revenue as opposed to gross revenue. The 2014 ballot measure did not propose eliminating the transfer altogether. And as our amicus points out, laws that fail to pass do not provide interpretive clues, as voters can have many reasons to vote a measure down.

10